Filed 7/2/18

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S079925 |
| v. | ) | |
| | ) | |
| JOSEPH ADAM MORA and RUBEN RANGEL, | ) | |
| | ) | |
| | ) | Los Angeles County |
| Defendants and Appellants. | ) | Super. Ct. No. TA037999 |
| _____ | ) | |

This automatic appeal arises from defendants Joseph Adam Mora and Ruben Rangel's 1999 convictions and death sentences for the attempted robberies and murders of Andres Encinas and Antonio Urrutia. Mora and Rangel contend that several errors occurred during the guilt and penalty phases of their trial. With one exception, we disagree. The exception consists of a guilt phase instructional error permitting the jury to find the multiple murder special circumstance true without finding that Mora or Rangel intended to kill or actually killed either victim. We nonetheless find the error harmless because of the overwhelming evidence supporting the jury's conclusion that each defendant actually killed the victim he shot, and both defendants were found guilty of two first-degree murders. Accordingly, we affirm the judgment.

## I. BACKGROUND

Defendants Joseph Adam Mora and Ruben Rangel were charged by information with two counts of murder (Pen. Code,[1] § 187), two counts of attempted robbery (§§ 211,

---

[1] All subsequent statutory cites are to the Penal Code unless otherwise noted.

SEE CONCURRING AND DISSENTING OPINION

664), the special circumstances of multiple murder (§ 190.2, subd. (a)(3)) and felony murder while in the commission of robbery (§190.2, subd. (a)(17)), and various enhancements.

On February 5, 1999, the jury found Rangel and Mora guilty of the first degree murders and the attempted second degree robberies of both Encinas and Urrutia, and determined that both Rangel and Mora used a firearm in the commission of each offense. The jury also found true the multiple murder and felony murder special circumstances with regard to both Mora and Rangel. On February 18, 1999, the jury imposed the death penalty on both defendants. The court denied Rangel's and Mora's motions for a new trial and modification of the verdicts of death on May 27, 1999, and on that date sentenced Rangel and Mora to death.

A.     Guilt Phase

**1.     The Murders**

In the early morning hours on August 24, 1997, Andy Encinas, Anthony Urrutia, and Fidel Gregorio drove to meet Encinas's girlfriend, Paula Beltran, at a gas station in Wilmington, where she and two friends were awaiting assistance to repair a flat tire on Beltran's car. Encinas and his friends had attended a party in Wilmington that night, where Beltran had been headed before she got a flat tire. Beltran, along with friends Mayra Fonseca and Yesenia Jimenez, had spent time at a nightclub earlier that evening. Beltran paged Encinas to tell him she would be delayed meeting him; Encinas insisted on driving the one block from the party to meet her where she was awaiting roadside assistance. Once Beltran's tire was repaired, the two cars planned to caravan to Beltran's home in Norwalk. On the way there, Jimenez asked to be taken to her home on Castlegate Avenue in Compton, and Beltran obliged. Encinas followed Beltran's car. When they arrived at Jimenez's home, Encinas said he would follow her into Jimenez's home because he needed to use a restroom.

Once their car was parked outside Jimenez's home, the three women and Encinas went into Jimenez's home for a few minutes. Jimenez then walked Beltran, Fonseca, and Encinas to her front gate. As the group walked toward Beltran's car, Beltran saw two men — later identified as Rangel and Mora[2] — approach along the sidewalk from down the street. Rangel asked Encinas, "Do you want to go to sleep?" Encinas did not respond. Rangel repeated the question, urging Encinas to respond. Encinas and Beltran each told one another to go to their respective vehicles. Fonseca began screaming at Beltran to open the car door, and Beltran did. Beltran and Fonseca got into Beltran's car. Encinas walked to his car, a Toyota 4Runner, with Mora and Rangel following him.

Encinas got into the driver's seat of the 4Runner. Urrutia and Gregorio had been waiting in the passenger seat and passenger-side backseat, respectively. As Encinas entered the car, he said "let's get the hell out of here," but Rangel had followed Encinas to the driver's side of the vehicle, and Mora stood at the passenger side.

Parked just behind Encinas, Beltran momentarily looked away from the two men standing outside Encinas's car to look, unsuccessfully, for her cell phone and call for help. Fonseca observed that Rangel stood immediately next to the driver's side of Encinas's car, holding a 12-inch-long metallic or "chromed" gun. Frightened, Fonseca lowered her seat to a reclined position while she screamed at Beltran to leave. When Beltran glanced back up she saw Mora and Rangel both pointing firearms into Encinas's vehicle. Beltran drove quickly away to find a payphone to call 911. Beltran and Fonseca remained at the phone until police officers arrived in response to her call.

From his vantage point in the backseat of Encinas's car, Gregorio could see both shooters. Rangel stood outside the driver's side door of Encinas's car and said to Encinas, "check yourself, check yourself, give me your wallet." As Encinas reached for

---

**2** Defendants Mora and Rangel were referred to both by name and nickname throughout their trial. For ease of reference we refer to them by their given last name here, but note that Mora's nickname is Joker, and Rangel's is Stranger.

his wallet, Rangel shot into the driver's side of the vehicle. Mora, on the other side of the car, also asked Urrutia for his wallet, and Urrutia told him he had no money but would give Mora his wallet anyway. Mora then shot into the passenger side of the vehicle, striking Urrutia's face and throat, and ultimately penetrating a large blood vessel that caused Urrutia to bleed to death. Rangel fired two more shots at Encinas; at least one entered Encinas's chest, fatally striking his lung and aorta. Mora and Rangel fired a total of four shots — all within seconds.

Immediately after the shooting, Mora and Rangel ran away. Gregorio got out of the car and began knocking on doors in the neighborhood and yelling for help. No one opened their doors, but he was eventually approached by two men who told Gregorio they had called the police.

### 2. Mora and Rangel's Activities Before the Shootings

On the evening of August 23, 1997, Lourdes Lopez — Mora's ex-girlfriend and the mother of their three-year-old daughter — paged Mora to come to her house so he could provide protection for her after she was threatened while attending a child's birthday party earlier that day. Lopez lived on Castlegate. Several people were present at Lopez's home that evening, including her daughter and the two adults she lived with, Nancy Gonzalez and Jade Gallegos. Also present at Lopez's house were Ricardo Zavalos, Enrique Parra, Russell Tungett, Jose Jimenez, and Ramon Valadez.

Mora and Rangel arrived at Lopez's home between 11:00 p.m. and 12:00 a.m. When Lopez arrived shortly after Mora and Rangel, she observed both men in her kitchen drinking alcohol and using methamphetamine. Lopez joined Mora and Rangel, snorted two or three lines of methamphetamine, and consumed four or five beers in the space of about 20 minutes. While sitting with the two men in her kitchen, Lopez noticed a gun in Rangel's waistband. Lopez told police that night that she had also seen Mora with a gun,

4

although she later testified that she was pressured into making that statement to police and never saw him with a gun.

Much of Lopez's testimony at trial differed from what she told police immediately following the shootings. What Lopez had told police is that in the early morning hours of August 24, 1997, she heard Rangel call Mora to go outside. Lopez also told police that Mora and Rangel were the only two people from the gathering at her house who had gone outside. However, at trial, Lopez claimed uncertainty regarding whether anyone went outside. She testified that she went into the bathroom right after she heard Rangel call to Mora to go outside, and testified that she saw both Mora and Rangel standing in her kitchen right before she entered the bathroom. Lopez testified that she heard gunshots two or three minutes later, while she was still in the bathroom.

In the statement she gave to police immediately after the shooting, Lopez said that she saw both Mora and Rangel run into the house through the kitchen door right after the shots were fired. Lopez testified inconsistently that she was in the bathroom for the moments before and after the shooting and did not see the two men run back into the house. Valadez, who had been at the gathering at Lopez's house, corroborated Lopez's statement to the police, testifying that he saw Mora and Rangel run into the house holding guns right after the shots were fired outside.

Prior to the gunshots she heard, Lopez recalled that Mora was not wearing a shirt, although he put a shirt on at some point that night after the shooting. Lopez testified that Rangel had been wearing a dark blue or black collared shirt that night, which he was still wearing when she exited the bathroom after the shooting. Lopez stated that Rangel took his shirt off at some point after the shooting.

Within minutes of the shots being fired, some commotion broke out at Lopez's house. Valadez testified that Mora and Rangel became excited, bragging that they shot two men and "blew their fucking heads off." Valadez observed that Mora was holding a black machine-gun style weapon; Rangel was holding a silver or chrome weapon with a

5

bullet visibly stuck in the chamber. Rangel claimed he would have fired more shots but his gun had jammed. Rangel was advised by partygoers to remove his shirt to wipe down his arms to clean off gunshot residue, which he did. Mora — who had not been wearing a shirt — did not wipe his arms; he donned a shirt at some point later that night. Valadez saw Mora and Rangel leave Lopez's house with their firearms. They returned empty handed a short while later.

Lopez told police that immediately following the shooting, Mora grabbed her car keys. At trial Lopez testified that she heard car engines and the sound of cars being moved around after the shooting. Lopez observed her car had been moved out of the garage — where she had parked it — and Mora's car had been moved into the garage, with Lopez's car parked behind it. Valadez noticed that Mora and Rangel arrived at Lopez's house earlier that night in an Oldsmobile, which they initially parked in a driveway and later moved to the garage after the shooting.

Lopez told police that Mora asked her to go to the bedroom where their daughter was sleeping in case the child woke up because of the commotion and so the child would not have to see "her daddy go to jail." Lopez testified differently, explaining that Mora had asked her to go into the bedroom only to ensure their daughter did not wake up during the kerfuffle following the shooting. In addition to the car movement, the rush of activity at Lopez's home after the shooting included the swift extinguishing of lights and music, and the closing of doors within the house.

### 3. Investigation

A radio call alerted police officers to a possible shooting on Castlegate. The call summoned two officers to Beltran and Fonseca's location at the pay phone — from which Beltran had dialed 911, one block from the shooting — while other officers simultaneously responded to the Castlegate location. Fonseca and Beltran initially spoke

6

with police officers by the pay phone, and later provided detailed statements at the police station.

At approximately 3:30 a.m., Compton Police Officers Raymond Brown and Sergio Lepe arrived at the Castlegate scene. Officer Brown saw two men sitting in the front seat of a 4Runner, nonresponsive, both with gunshot wounds. Bullet casings were strewn on the ground around the driver's side of the vehicle. Two wallets were visible in the vehicle; Encinas's was in the center console and Urrutia's was in the passenger seat. There was a can of Budweiser beneath the 4Runner.

Around dawn that morning, police knocked on Lopez's door on Castlegate. Officers interviewed everyone at the house. Following Beltran and Fonseca's interviews at the police station, they were driven back to Castlegate to be shown potential suspects to identify. About 10 individuals, including the partygoers at Lopez's house, were shown to Beltran and Fonseca in a field lineup.

Gregorio had witnessed the shootings from the backseat of the 4Runner. He participated in the field lineup, identifying Mora and Rangel as the shooters. Gregorio had told the police earlier that night that the shooters were two Latino men. He described the man on the passenger side, Mora, as shirtless and wearing Joe Boxer brand boxer shorts and low slung, sagging pants. Gregorio noted that Mora also had a tattoo on his stomach. Gregorio recalled that the subject of the tattoo was a cross, but observed upon close inspection in the courtroom that the tattoo was in fact a handwritten name. Gregorio also observed that Mora had a scar on his abdomen that bisected the tattoo "down like a cross" with "the name cutting across" the scar. Gregorio testified that he remembered Mora's face, and acknowledged that although the tattoo he recalled and the one he observed on Mora were not identical, Gregorio knew the man on the passenger side of the vehicle was Mora, stating, "It's him, I know it's him. I'm 100% sure." Gregorio observed that the man on the driver's side of the car, Rangel, was wearing blue track pants and a blue or black shirt.

7

Compton Police Officers Eric Strong and Lepe spoke with witnesses on Castlegate Avenue. John Youngblood, who lived on Castlegate near the location where the 4Runner had been parked, was watching television in the early morning hours of August 24, 1997. He heard two gunshots, looked out his window, and observed two men standing by a 4Runner. There were a number of streetlights that illuminated the area. Youngblood described the lighting as "just like day." Youngblood observed Rangel, wearing a white t-shirt and normal length grey khaki pants, standing just outside the driver's side door of the 4Runner, and noted that the man by the passenger-side door wore dark clothing and had short hair. After hearing several more shots being fired, Youngblood saw two men, one of whom was Rangel,[3] running away from the 4Runner.

Another witness, Sheila Creswell, who lived across the street from Lopez and was unable to sleep because of the noise of the gathering there, noticed that Rangel was among the partygoers. Creswell heard gunshots, ran to her window, and observed two men with shaved heads running from a truck parked down the street from her house. Creswell identified Rangel as one of the men she saw running; she also identified one of the residents of Lopez's home, Jade Gallegos, as the other man. She saw both men enter Lopez's home, and shortly thereafter observed all the lights in Lopez's home turn off.

When Lopez's door was first opened in response to their knock, Officers Strong and Lepe noticed several people in the living room and numerous cans of Budweiser of the same type as the one found beneath the 4Runner strewn about. Officers Lepe and Strong examined Lopez's home with her consent, finding an Intratec gun case and a black shirt. Officer Strong, along with Officer Brown, walked around the house to

---

**3**     Several days before testifying, Youngblood identified a different individual in a photographic array shown to him by the prosecutor. Upon testifying, Youngblood explained that the man in the photograph he initially identified "just doesn't look like the guy," claiming instead that he was "positive" the man he saw on August 24, 1997, was Rangel.

Lopez's detached garage, which Lopez provided consent to search. Partially inside the garage, with the garage door resting atop it, officers found a burgundy Oldsmobile with two firearms on the passenger-side floorboard. Mora denied at the scene that the vehicle was his, but Valadez confirmed that he saw Mora drive the car. Additionally, Lopez described the car as Mora's, and Mora's cousin, Candy Lopez, confirmed at trial that although the car's bill of sale was in her name the car actually belonged to Mora.[4] Police found a loaded TEC-9 nine-millimeter semiautomatic assault rifle with the word "Intratec" written on it and an Astra chrome-plated semiautomatic pistol with a bullet jammed at the breech in Mora's vehicle.

Los Angeles County Sheriff Criminalist Dale Higashi examined the Intratec and Astra firearms, noting that the Astra was jammed due to a feeding problem. After comparing casings recovered from the crime scene with those produced during ballistics testing, Officer Higashi concluded that three casings were fired from the Astra and an expended cartridge case originated from the Intratec. The bullet recovered from Encinas's body was shot from the Astra and the bullet recovered from Urrutia's body was shot from the Intratec.

### 4. Defense Evidence

The defense presented evidence that witnesses inconsistently described the shooters' clothing. For example, in Beltran's initial statement to Officer Gonzalo Cetina, she identified one of the shooters as wearing no shirt with grey pants, and the other as wearing all brown clothing. As described above, Castlegate resident Youngblood described Rangel as wearing a white t-shirt and khaki pants, while the other shooter wore all dark clothing. Gregorio noted that Mora was shirtless, had a tattoo on his abdomen,

---

**4**    Candy Lopez confirmed that the car was not formally registered with the DMV. Mora paid for the car, but used his cousin's name on the bill of sale because he lacked automobile insurance.

and wore Joe Boxer brand underwear with sagging pants.  Gregorio testified that Rangel wore blue track pants and a blue or black shirt.  At the field lineup, Gregorio was only able to identify Mora, describing him as the shirtless man that stood on the passenger side of the 4Runner.[5]  Officer Timothy Dobbin, who took Fonseca's statement, wrote down that she identified Mora as the man on the *driver's* side of the vehicle who had asked Encinas if he wanted to go to sleep, although Officer Dobbin testified that he may have reversed Mora and Rangel's identities.

Jade Gallegos lived with Lopez and attended the party.  He was Latino, had a shaved head, a tattoo on his abdomen, and appeared to be the same height and weight as the suspects described by witnesses.  Beltran described both shooters to police as appearing to be about 5'8."  In fact, Gallegos was 5'6" or 7," while Mora was 5'11."  Neither Gallegos nor Mora had been wearing shirts prior to the shooting.  Castlegate resident Sheila Creswell, who lived across the street from Gallegos and saw him daily, testified that she saw Rangel and *Gallegos*, not Mora, running away from the 4Runner after she heard shots fired on the morning of August 24, 1997.  Creswell acknowledged she never saw the faces of the two men.

Rangel also presented evidence concerning gunshot residue.  A residue test was performed on Rangel at about 9:30 a.m. on August 24, 1997.  The result of the testing was inconclusive.  Only irregularly shaped lead and tin particles were found on Rangel.  No residue was noted on Rangel's hands.

Mora presented no defense evidence save for a stipulation that an exhibit was a true and correct photograph depicting the way Mora looked on August 24, 1997.

---

[5]     Officer Ed'ourd Peters testified that Gregorio made only one identification, of Mora, during the field lineup, although Gregorio testified that he identified both Mora and Rangel during that lineup.  Gregorio positively identified both Mora and Rangel during the preliminary hearing, and confirmed at trial that he was able to, and did, identify Rangel as well as Mora.

B.      Penalty Phase

### 1.      Rangel Aggravating Evidence

Rangel was arrested in 1995 and charged with burglary of a motor vehicle, terrorist threats, and vandalism; Rangel was ultimately convicted of second degree burglary of an automobile. In October 1995, Alejo Esquer testified (reluctantly) that he saw Rangel and another man pushing his truck away from where it had been parked and locked. The window of the truck was broken, the number 13, letter T and "KCC" had been painted onto the truck, and the stereo and speakers had been pulled out of the truck. Rangel began to run away once Esquer saw him, and Esquer gave chase. Esquer confronted Rangel, and Rangel told Esquer that Rangel knew where Esquer lived and if Esquer did not leave Rangel alone or if he called the police, Esquer would be killed.

Kevin Hilgendorf, a deputy sheriff for Los Angeles County, was the officer who arrested Rangel for this. He responded to a call reporting a vehicle theft in progress, and he observed Rangel and other men standing on a sidewalk near a truck with a broken window, and its stereo and speakers removed. Officer Hilgendorf observed the letters "KCC" spray-painted in white on the truck, which he since learned meant "King City Criminals." Officer Hilgendorf did not recall seeing the number "13" painted on the truck, although a gang expert, Officer Andrew Zembal,[6] testified that the number is also associated with the King City Criminals. A can of white spray paint was on the sidewalk near the group of men and Rangel had white paint on his hands. Esquer told Officer Hilgendorf that Rangel threatened Esquer's life — a threat Officer Hilgendorf took seriously given Rangel's gang affiliation. Esquer felt sufficiently concerned about Rangel's threat that he moved to a different residence before Rangel's anticipated release from jail.

---

[6]      Officer Zembal testified that Rangel is a "hard core gang member" with a wanton disregard for life, as evidenced by his numerous, highly visible tattoos.

### 2. Mora Aggravating Evidence

In July 1996, Mora was in custody at the Los Angeles County Jail. During this period of incarceration, Mora assaulted fellow inmate Paul Juhn, stole the mattress from Juhn's bunk, and returned to Juhn's bunk with several other men, all of whom yelled racial epithets at — and physically assaulted — Juhn. Juhn identified his assailants during a jailhouse lineup, and Deputy Kresimir Kovac, an officer at Los Angeles County jail in July 1996, later determined one of the men identified was Mora. Deputy Kovac noted at the time of the Juhn assault that Mora had a distinctive tattoo comprised of three words; Deputy Kovac testified at Mora's trial that Mora still bore that tattoo.

### 3. Encinas Victim Impact Evidence

Luz Gamez was Encinas's sister. She testified that Encinas was an avid sportsman while attending St. Anthony's high school. Encinas's family would attend his football, baseball, and basketball games. Following high school, Encinas attended community college and worked as a dispatcher. He hoped to become a police officer and had passed the Los Angeles Police Academy's test just two months prior to his death.

Gamez testified regarding childhood pictures of Encinas, which showed Encinas's father standing with him at several sporting events, as well as Encinas's baptism and other childhood events. Encinas was a shy, loving, helpful child and young man. He enjoyed a close relationship with his nephew, Edgar, Gamez's son. Edgar, who was nineteen years old at the time of the trial, continued to sleep in the room they shared, in the bed next to Encinas's former bed. Sergio Encinas, Encinas's older brother, testified that Encinas "was a 300-pound teddy bear. He was lovable. Everybody liked him. Everybody."

Encinas was to have attended a wedding with his family the day he was shot, but worked instead. When the family returned home that night, Encinas still was not home. Encinas's mother waited up for him all night, finally calling Encinas's sister around

12

6:00 a.m. to tell her Encinas had been shot and was in surgery. By the time the family arrived at the hospital, Encinas had died.

Sergio was asked to identify his brother's body. Sergio testified that he was taken to the morgue, saw his brother's dead body, and had to inform his parents and family that Encinas had died. Sergio described the experience as very painful: "it ruined me, too, physically, mentally, telling, you know, your mom, your dad, your brother, your uncle, 'he will never be here. You will never see him alive.' "

Encinas's mother and father became ill following their son's death. Encinas's father was so emotional following Encinas's death that the family decided not to tell him when the trial was taking place, fearing for his health and the potentially exaggerated nature of his reaction were he to attend the trial. Encinas's mother was too ill to attend the trial, although she knew when it was taking place. Sergio Encinas also suffered physical ailments as a result of his brother's death, including ulcers and headaches. Encinas's family views his death as a pain that can never be healed.

Beltran, Encinas's girlfriend, testified about how she was affected by his death. The two had planned to marry and dreamed of having children together. Beltran felt guilty in the wake of his murder, believing that if she had not paged him, he would still be alive. She has not been able to forgive herself.

### 4. Urrutia Victim Impact Evidence

Urrutia's sister, Olivia Perez, testified that Urrutia dreamed of becoming a police officer. Urrutia attended Long Beach City College after graduating from high school and passed the test for the Long Beach City Police Department before he had reached the minimum age of eligibility. He passed the test for the Los Angeles Police Department four months prior to his death. Out of deference to his parents, who feared for his safety and required his financial assistance, he continued to put off his dream of becoming a police officer, working as a loan representative in the meantime. Urrutia was honored

13

posthumously: his workplace closed for a week in the wake of his death, and Long Beach City College erected a mural in his honor for the month of September 1997.

Urrutia's sister testified regarding childhood photographs of her brother. The photos depicted Urrutia's first communion and high school graduation, as well as photos of him as a child, with his family, and at work. Urrutia joined the Explorer Scouts as a child. He volunteered as an interpreter at St. Mary's Hospital, assisting with Spanish translation between patients and doctors. Urrutia also volunteered on a neighborhood committee to clean the area and rebuild local homes.

Urrutia and Encinas played football together. Urrutia's nephew, Javier Soto, was two years younger than Urrutia and played sports and attended school with him. Soto recalled that the group of friends of which Urrutia and Encinas were a part was "unbelievable," and Soto misses Urrutia every day.

Urrutia's mother, Virginia Urrutia, testified about her close relationship with her son, who attended church with her weekly. Urrutia had also been close with his father until his father's death. Urrutia had helped his family care for the father's grave. Urrutia's mother fondly remembers Urrutia's time as an altar boy between the ages of seven and twelve. Urrutia lived with his mother at the time of his death, and she recalled waiting up for him many nights, including the night he died.

### 5. Rangel Mitigating Evidence

Rangel's mother testified that she began living with Rangel's father, Ruben Gomez Rangel, when she was 17 years old. After her mother died when she was a child, Rangel's mother grew weary of acting as a parent to her four younger sisters. Living with relatives and alone, Rangel's parents changed residence about four times before Rangel was born in 1975. Rangel also has an older sister, Carmen, born three years before him.

14

Rangel's parents abused alcohol and, from the time Rangel was about six years old, began using heroin. Once, when Rangel was nine years old, he saw his parents in the bathroom at home preparing to inject heroin. Rangel's parents' drug use was in part financed through a settlement Rangel's father received following a workplace injury. Rangel's mother routinely used heroin while Rangel and his sister were home and she was purportedly providing care for them. Rangel's parents sometimes failed to feed their children and Rangel's older sister, Carmen, would find food for her and Rangel to eat. Rangel's mother sometimes took her children with her to use heroin with her sisters.

Rangel's mother testified she used heroin and provided poor care for her children. Rangel's father also neglected his children when trying to obtain more drugs. Rangel's father sometimes became violent when he consumed alcohol. Rangel's parents separated when Rangel was about five years old; Rangel lived with his father for a few years after that. Rangel's mother continued to use heroin for several more years, supporting her habit via prostitution, although she endeavored to hide her means of making a living from Rangel. Rangel's mother stopped using heroin in the late 1980s, after her sister died from a heroin overdose. By the time of Rangel's trial, Rangel's mother had been drug-free for 11 years. After Rangel's mother stopped using heroin, Rangel and his sister began living with their mother again. Rangel cut his hair short and began to favor wearing baggy clothing. Rangel's sister did not believe Rangel was becoming a member of a gang. Rangel knew his father was a gang member. When Rangel was 10 years old, he and his father were shot at by a rival gang. Rangel's father advised Rangel to avoid gangs. Rangel's mother could not recall whether Rangel graduated from high school. His father recalled that Rangel attended high school for some time but had not graduated.

As a teenager, Rangel began attending church with his mother. Over the course of several years, Rangel attended bible study with Jose Jimenez.[7] Jose testified that it was hard to believe Rangel had been convicted of murder, and that he would have been surprised even to hear that Rangel had attempted to steal a car or that he had made threats against the owner of that car. Rangel married his wife, Aurora Rangel, in Jose's home. Rangel and Aurora had a daughter, Vanessa. After Aurora and Rangel split up, Rangel saw Vanessa once every two weeks. Aurora has not told their daughter where Rangel is, despite the daughter's queries. Rangel also had a girlfriend, Desiree Leanos, with whom he had two children, the youngest born after his arrest. Leanos testified that she visits Rangel weekly with their two children, despite the fact that Rangel has a new girlfriend, whom he met months before he was arrested. The jury was shown photos of Rangel's daughters and the other members of his family.

On the day of the shooting, Rangel attended a family barbeque along with Leanos, Vanessa, and other members of Rangel's family to celebrate the birthday of Rangel's half-sister. Rangel fell asleep at about 9:00 p.m. after spending the day drinking, and was paged around 11:30 p.m. to go somewhere. Desiree urged Rangel not to leave, but he bade her and their daughter goodbye and left.

### 6. Mora Mitigating Evidence

Mora's father, Cruz Mora, testified that he was not certain of his paternity because he knew that Mora's mother, R.M., had sexual relationships with many members of his family. Cruz testified that he and his family members paid R.M. for their sexual encounters. Cruz married R.M. when she was eight months pregnant. The couple's

---

**7** Jose Jimenez will be referred to throughout as "Jose" to avoid confusion with Yesenia Jimenez (referred to throughout as Jimenez), the friend of Paula Beltran whose house on Castlegate was the site of initial contact between defendants and the victims, and to avoid confusion with the partygoer at Lopez's house, also named Jose Jimenez.

marriage was not happy and Cruz physically abused R.M. Cruz left R.M. four years into the troubled marriage, but the two reunited some time thereafter for a few years.

After his parents' divorce, Mora lived with his aunt for a few months. Mora returned to his mother's home between the ages of five and thirteen, during which time R.M. was frequently absent from the home working, drinking at bars, and using drugs. R.M. remarried, and Mora again lived with his aunt, who provided good care. Mora never returned to his mother's home. R.M. testified that she believed herself to have been a bad mother and wished she could take Mora's place if he was to be executed.

When Mora was 14, he moved in with his 19-year-old cousin, Candy Lopez. Mora then became involved with Lourdes Lopez (who was not related to Candy) and Lourdes Lopez and Mora had a daughter together when Mora was 18 years old. The jury was shown photos of Mora with his daughter and family.

Mora, Lopez, and their child lived with Cruz for a couple of months when Mora was 19, until Cruz asked them to leave because they were messy. When Mora was 19 years old he suffered a gunshot wound, and Cruz visited him in the hospital during his recovery. After Cruz asked Mora and his family to move out, Cruz had little contact with Mora.

## II. DISCUSSION

A.    Guilt Phase

### 1.    Discovery Delays

a.    *Background*

Mora and Rangel allege that a number of documents were not disclosed in timely fashion during the discovery process: one of two transcripts of Lopez's interview with police on the day of the shooting, diagrams of the scene, police reports containing witness interview notes, a gunshot residue (GSR) report, and a report containing the results of fingerprint testing. The disclosure of each is addressed below.

17

On January 19, 1999, during Lopez's testimony, Rangel discovered that he had been given only the first of two transcripts of Lopez's interviews with police. Rangel's attorney informed the court that she was missing a copy of that transcript. Mora's attorney had copies of both transcripts, and the prosecution asserted that copies of the two transcripts had also been provided to Rangel. The court resolved the issue by concluding proceedings for the day to allow Rangel's counsel time to make a copy of the transcript and review it before Lopez's testimony resumed the following day. No objections to this course of action were made.

Before court adjourned, Rangel's counsel noted that she was also missing a copy of a diagram she had seen a day or two earlier in Detective Mike Piaz's notebook.[8] She had asked Detective Piaz for a copy of the diagram, and when Detective Piaz complied he provided a copy of a second diagram that Rangel's lawyer also had not seen before. Both were diagrams of the scene and both were dated August 26, 1997; neither had been disclosed during discovery. Mora's lawyer also had not received copies of the two diagrams during discovery.

The prosecution assured the court and defense that it had provided Mora and Rangel with copies of all documents. The court suggested that Rangel's attorney review the documents stored in Detective Piaz's office to determine whether she was missing copies of anything else. Rangel's attorney did so.

The next morning, on January 20, 1999, Rangel's attorney informed the court that review of the documents stored in Detective Piaz's office revealed further discovery neither she nor Mora's counsel had received, including a number of reports containing "very critical" information about witnesses. Specifically, the undisclosed documents included a four-page report dated August 24, 1997, regarding Enrique Parra; an eight-

---

[8] Detective Piaz replaced Detective Marvin Branscomb as the lead detective on this case on April 1, 1998. The jury was advised that Detective Piaz would be assisting the prosecutor throughout the trial.

page report dated August 24, 1997, regarding Jade Gallegos; a three-page report concerning Ramon Valadez with an attached warrant; and a nine-page follow-up investigation report prepared by the Compton Police Department, which contained a number of witness statements. The nine-page report contained statements from thirteen neighborhood witnesses, none of whom had been previously disclosed to the defense. Mora and Rangel argued that several of the undisclosed witnesses made observations inconsistent with the testimony already given. Had the nine-page witness report been made available earlier, they asserted, the scope and subjects of the already-conducted cross-examination would have differed.

Because these reports, along with the two diagrams and Lopez's interview transcript, had not been provided to the defense until trial was well underway, Mora and Rangel requested that the case be dismissed. The court indicated it would "consider a less dramatic sanction than that at the outset," and Rangel and Mora sought a week-long recess to investigate the witness statements contained within the nine-page report. The court acknowledged that it was troubled by some of the statements in the newly discovered reports and "more than a little concerned about the fact that" the reports had not been "delivered to defense counsel." The prosecutor clarified that the newly discovered reports were also not in her possession.

The court agreed with Mora and Rangel that further investigation was warranted, at least with regard to two witness statements. These statements described how a car drove away from Castlegate around the time shots were fired, and how a woman's voice was heard outside arguing around the time shots were fired. The court granted a five-day recess to permit the defense time to interview the newly disclosed witnesses, and ordered a status conference be held two days later to confirm that a five-day recess would be sufficient. Counsel for Mora told the court, "We'll do the best we can within that time frame, your honor."

19

That same day, January 20, 1999, the prosecution turned over additional documents not previously provided to the defense: a witness statement by Jimenez, the passenger in Beltran's car who lived on Castlegate; a warrant regarding Gallegos; and a receipt related to a GSR report. The GSR report had been provided to the defense, but not until January 7, 1999, just five days before trial began. Due to the report's late disclosure and its inculpatory nature with regard to Mora, the court excluded it. Rangel was permitted to address the report and did so, but was prohibited from commenting on it as it related to Mora. Only the receipt for the report was turned over on January 20, 1999.

At the January 22, 1999, status conference, Rangel's counsel announced readiness to proceed at the conclusion of the five-day recess. Mora's investigator had difficulty contacting one of the 13 witnesses. The court and prosecutor discussed the fact that the witness's family had been cooperative, and the court was confident the witness could be reached before trial resumed on Monday. Mora's attorney asked the court how to proceed if the witness could not be reached by the conclusion of the five-day recess, and the court advised to "keep at it." No objection or further colloquy followed.

In light of the numerous late-disclosed documents, the defense again requested that the case be dismissed. Mora and Rangel argued that most if not all the undisclosed discovery contradicted prior testimony and the prosecution's case. The court denied the request, but echoed the concern that some of the newly discovered statements may have been "contrary to the evidence that's been presented in court so far." The court explained that the remedy to date had been to suspend the trial and provide counsel with "an opportunity to communicate with these witnesses." Mora and Rangel then requested a jury instruction be provided concerning the late discovery, and the court acceded, asking

20

that an instruction be prepared for its review when they reached that phase of the proceedings. Proceedings resumed the following Monday, January 25, 1999.[9]

On February 2, 1999, after the prosecution rested, another previously undisclosed document, a fingerprint testing report, was turned over to the defense. Throughout the proceedings, the defense claimed the prosecution maintained that no fingerprint testing had been conducted. In fact, four shell casings and the beer can beneath the 4Runner had been tested for fingerprints, but the Intratec and Astra magazines and rounds had not been tested, nor had four of the expended shell casings. No fingerprints were found on the tested items.

When they received the fingerprint report, Mora and Rangel requested a mistrial. They argued that the "continuum" of discovery violations warranted relief, and specifically that the failure to timely disclose the fingerprint report impaired their ability to effectively cross-examine police officers who testified during the prosecution's case-in-chief. The court declined to grant a mistrial. Mora and Rangel then proposed the court exclude the fingerprint report, permitting the parties to proceed as though it never existed. The court denied this request, as well, expressing concern about misleading the jury. Instead, the court proposed informing the jury about the content and recent discovery of the fingerprint report, and suggested clarifying for the jurors that no party had been aware of the report prior to its discovery. The court assured counsel that the jury would "be given a specific instruction later." The court then informed the jury as described.

At the conclusion of the guilt phase, Mora provided the court with a proposed special instruction concerning the discovery delays. The court rejected that instruction,

---

[9]     At the conclusion of the first day of resumed proceedings, four of the witnesses identified in the previously undisclosed report appeared in court in response to a prosecution subpoena. One of the witnesses, John Youngblood, testified for the prosecution later in the proceedings. Rangel raised claims regarding his alleged inability to prepare for cross-examination, addressed in section II.A.2., *post*.

21

instead giving CALJIC No. 2.28, fully set forth in footnote 12, *post*, modified to include the stipulations contained in Mora's proposed instruction. The court twice indicated its intent to hold a sanctions hearing at the end of the trial regarding the discovery delays, although no such hearing ever occurred.

b. *Discussion*

1. Statutory and *Brady* Error

Mora and Rangel allege the prosecution's failure to timely disclose the documents and reports described above violated the discovery statutes and constituted *Brady*[10] error. A trial court's discovery rulings are reviewed for abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 299.) The trial court possesses the discretion to determine what sanction is appropriate to ensure a fair trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 951 (*Jenkins*).) Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (*Brady*, *supra*, 373 U.S. at p. 87.)

Mora and Rangel admit they eventually received the relevant documents from the prosecution. But they contend that the delayed disclosure of discovery constituted a *Brady* error of constitutional magnitude because the documents were not received within sufficient time to use it effectively at trial. (See *People v. Wright* (1985) 39 Cal.3d 576, 590–591.) They further argue that the prosecution had a duty to disclose any exculpatory evidence it reasonably could have learned, even if the prosecution was actually unaware of that evidence. (*In re Brown* (1998) 17 Cal.4th 873, 879–880.)

Mora and Rangel also allege the delayed disclosure of documents constituted a violation of the discovery statutes. Section 1054.1 provides, in pertinent part, that the "prosecuting attorney shall disclose" certain types of material to defense counsel if the

---

**10**      *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).

22

evidence "is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." Such disclosure "shall be made at least 30 days prior to the trial" or as soon as the prosecution learns of the documents or information. (§ 1054.7.) To prevail on a claim alleging a violation of discovery statutes, an appellant must show there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 (*Zambrano*).)

No *Brady* errors occurred here. Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery. (*People v. Verdugo* (2010) 50 Cal.4th 263, 281, citing *People v. Morrison* (2004) 34 Cal.4th 698, 715; but see *U.S. v. Devin* (1st. Cir. 1990) 918 F.2d 280, 289; *U.S. v. Scarborough* (10th Cir. 1997) 128 F.3d 1373, 1376.) In *U.S. v. Devin* and *U.S. v. Scarborough*, the First and Tenth Circuit Courts of Appeals addressed an issue similar to the one presented here, explaining that when considering whether delayed disclosure rather than "total nondisclosure" constitutes a *Brady* violation, "the applicable test is whether defense counsel was 'prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case.' " (*U.S. v. Devin*, *supra*, 918 F.2d at p. 289; see also *U.S. v. Scarborough*, *supra*, 128 F.3d at p. 1376.) Both courts examined exculpatory evidence belatedly disclosed, ultimately finding no error arose from that delayed disclosure. (*U.S. v. Devin*, *supra*, 918 F.2d at p. 289; see also *U.S. v. Scarborough*, *supra*, 128 F.3d at p. 1376.)

We likewise conclude no prejudice arose from the instances of delayed disclosure. The prosecution's failure to disclose the fingerprint reports during the normal course of discovery did not result in prejudice to defendants. The fingerprint report was made available to the prosecutor and defense counsel as soon as it was discovered to have been unintentionally omitted, and the court admitted it with an admonition to the jury

23

regarding its untimely disclosure.  Accordingly, no *Brady* error resulted.  (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 281; *Brady*, *supra*, 373 U.S. at p. 87.)

We similarly conclude defendants were not prejudiced by the delayed disclosure of diagrams and police reports containing witness statements.  Although they were not admitted at trial, they did not constitute favorable evidence that was suppressed within the meaning of *Brady*.  (*Brady*, *supra*, 373 U.S. at p. 87.)  After learning that some of the witness statements contained information that differed from testimony already adduced, the court called for a five-day recess to ensure that defense counsel had adequate time to investigate.  They did, and failed to present any evidence as a result of those investigations.  Neither Mora nor Rangel sought to recross-examine any of the witnesses that had provided prior testimony, and neither indicated anything more than the five-day recess was needed to cure the late disclosure; Mora announced readiness to proceed at conclusion of recess, and Rangel did not object to court's announcement that trial would resume at conclusion of recess.  Accordingly, no prejudice resulted from the delayed disclosure of witness statements.

We also find no statutory error.  Mora and Rangel assert that the trial court found the discovery statutes were violated, but the court made no such finding.  Defendants argue that the evidence was accessible to the prosecution because it was located in Detective Piaz's trial notebook, rendering the failure to disclose it a violation of section 1054.1.  While it is concerning that the prosecution was unaware of so much about the case that resided in the Compton Police Department's files, no statutory error arose.  Because "the material and information [became] known to, or [came] into the possession of, a party within 30 days of trial, [and] disclosure [was] made immediately," no violation of the discovery statutes occurred.  (§ 1054.7.)  No prejudicial statutory violation can be made out because neither Mora nor Rangel can demonstrate a reasonable probability that the results of the proceedings would have been different had the evidence been timely disclosed.  (*Zambrano*, *supra*, 41 Cal.4th at p. 1132.)

24

That said, the number of discovery delays that occurred in this case gives cause for concern, as the trial court noted. Nonetheless, as soon as the prosecution learned of various late-disclosed documents, they were made available to the defense. The gunshot residue report was not completed until the day before it was provided to the defense. The crime scene diagrams were discovered by Rangel; the prosecutor had never seen them. The police reports containing witness statements were likewise discovered by defense attorneys. Lopez's second interview transcript was given to Mora, and the fact that Rangel did not have it far in advance undoubtedly did not alter the outcome of the trial. (See *Zambrano*, *supra*, 41 Cal.4th at p. 1132.) Finally, the prosecution had not been aware that a fingerprint report existed, and when a prosecution witness became alerted to the possibility that a report had been made but not disclosed to the parties the report was immediately located and disclosed.

Rangel and Mora argue they were "simply unable mid-trial to make the effective use of the untimely disclosed evidence." Yet they provide no example of choices that would have differed had the discovery been made available earlier, and the record reveals no obvious defense strategy foreclosed by the late disclosure. In fact, Mora and Rangel were able to contact every witness listed on the previously undisclosed police reports. Neither Mora nor Rangel sought to further cross-examine any witness who had testified before the police reports were discovered and disclosed. Further, Rangel and Mora both had an opportunity to review and utilize the transcripts of Lopez's interview with police. Rangel was able to present evidence regarding the somewhat exculpatory gunshot residue report. Most tellingly, short of a new trial, neither Mora nor Rangel sought a remedy the court did not provide.

Although Mora and Rangel allege the trial court abused its discretion by failing to grant a mistrial, we find no error. In *People v. Wright*, as here, the prosecution inadvertently failed to disclose certain police reports containing witness statements that differed from prosecution evidence previously presented. (*People v. Wright*, *supra*,

25

39 Cal.3d at p. 590.) Rather than granting mistrial or dismissal, the court instructed the jury and permitted the defense to reopen testimony to address the erroneously suppressed evidence. (*Id.* at pp. 590–591.) The defendant argued that the remedy was insufficient to cure the error, but we disagreed. Because the suppression was discovered before a verdict was rendered — indeed, before jury deliberations had begun — we concluded, particularly in light of the remedy provided by the trial court, that the suppression did not deprive the "defendant of a fair trial." (*Id.* at p. 591.)

In similar fashion, Mora and Rangel had an opportunity to address the late-disclosed evidence in this case. Their assertion on appeal that trial counsel "had a materially incorrect understanding of the state of the evidence when developing" the defense theory "and when cross-examining prosecution witnesses" is unsupported. Neither sought to conduct further cross-examination of any witness. Mora and Rangel now contend that the remedies offered by the court were not only inadequate but at times caused further harm, and that it is impossible to imagine how the trial would have gone absent the discovery errors. This claim is specious.

The court gave Mora and Rangel an opportunity to propose remedies. Indeed, other than dismissal or mistrial, the remedies requested were provided. Accordingly, it does not appear the court abused its discretion, particularly because it provided Mora and Rangel with the relief they sought. (*Jenkins*, *supra*, 22 Cal.4th at p. 951 [court possesses discretion to determine what remediation ensures fair trial].) Moreover, the court did not abuse its discretion by denying Mora and Rangel's motions for mistrial as that remedy would have been unduly extreme given the stage of proceedings. (*People v. Harris* (2013) 57 Cal.4th 804, 848 [trial court possesses broad discretion in ruling on motion for mistrial]; see also *People v. Wright*, *supra*, 39 Cal.3d at p. 591.)

Finally, to the extent any error resulted from delayed disclosure, it was harmless because there is no reasonable probability that any error affected the trial result. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); *Zambrano*, *supra*, 41 Cal.4th at

p. 1135, fn. 13.) Mora and Rangel had an opportunity to address the late-disclosed evidence and, for the most part, declined to do so. What little untimely discovery existed inculpating Mora or Rangel was suppressed by the court. Where the evidence was exculpatory, Mora and Rangel were permitted to — and did — address it. To the extent the evidence was equivocal, Mora and Rangel were given an opportunity to investigate and argue the import of that evidence. Indeed, Mora and Rangel may have fared better in their trial in light of the late disclosure because it resulted in the exclusion of some unfavorable evidence. They were not harmed by the late disclosure because they were able to use the evidence as they would have if it had been timely disclosed. Accordingly, the error, if any, was harmless.

### 2. Instructional Error

At the end of the guilt phase, Mora requested that the court provide a special instruction concerning the discovery delays.[11] The court declined to give the requested instruction, but gave instead a modified version of CALJIC No. 2.28 that explained the rules of discovery and noted that the Compton Police Department failed to timely disclose reports containing witness statements and a fingerprint testing report.[12] The

---

[11] In its entirety, the proposed instruction stated, "In this case the Prosecution violated the Discovery Laws by failing to turn over to the Defense, police reports involving this case, and other evidence. The law requires that all discovery must be reciprocal and given to the defense 30 days prior to the start of trial. [¶] This violation was unfair to the defense and put them in a position where they have had to continue to investigate this case during the course of the trial. [¶] This violation was largely attributed to the Investigative officers and Detectives from the Compton Police Department who withheld these reports from the Defense. [¶] You may consider this violation and give it whatever weight and/or significance you believe it deserves in your deliberations."

[12] The instruction given by the court stated, in its entirety, "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or

court stated that its modification of CALJIC No. 2.28 "specifically left out" language regarding intent from the standard instruction "because I don't think there is any showing of intent. I think it's more negligence than anything else based on what I have heard." Neither Rangel nor Mora objected to the court's instruction as given or the court's characterization of the discovery delays as negligent.

Rangel also requested that the court instruct the jury that the beer can found beneath the 4Runner was not immediately made available to a defense expert. The court declined that request because it was factually inaccurate; the can was provided promptly once defense counsel requested it.[13]

Mora and Rangel now contend the court erred by failing to give the requested instruction regarding discovery delays, and that it erred by using the modified version of CALJIC No. 2.28 to instruct the jury. They argue that the instruction, as given, was incomplete because it identified the Compton Police Department as the party responsible for the discovery delays, not the prosecution generally. Mora and Rangel further argue that the instruction should have clarified that the prosecution "concealed" the evidence.

---

produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the Compton Police Department failed to timely disclose the following evidence: [¶] 1) Witness statements elicited from people residing on Castlegate Avenue on August 24, 1997, including a statement from John Youngblood; and [¶] 2) Fingerprint analysis report dated December 3, 1997. [¶] Although the Compton Police Department's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] The weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence."

[13]     When Rangel initially requested the beer can be brought to court to aid in witness testimony, he was misinformed by a member of the Compton Police Department that the can could not be located. In fact, the prosecution did know the location of the can and, once Rangel requested it, made sure the can was retrieved and brought to court later that same day.

Finally, they contend that CALJIC No. 2.28 fails to adequately guide a jury's understanding of how tardy discovery should impact deliberation.

Because Mora and Rangel failed to object to the court's modifications of CALJIC No. 2.28, their claim of error on appeal is forfeited. (See *People v. Bolin* (1998) 18 Cal.4th 297, 326 [failure to object to wording of jury instruction forfeits appellate claim of error].) Even if Mora and Rangel had preserved this claim for appellate review, the trial court did not err by declining to give the requested special instruction, nor did it err by deploying the modified CALJIC No. 2.28 to instruct the jury. It is true that CALJIC No. 2.28 has been the subject of significant criticism in the courts of appeal. (*People v. Riggs* (2008) 44 Cal.4th 248, 306–307.) Many such critiques are inapposite, as they relate to discovery delays caused by a defendant, not those caused by the prosecution. Nonetheless, the instruction's detractors have claimed — as do Mora and Rangel in this case — that it fails to "provide explicit guidance to the jury regarding why and how the discovery violation would be relevant to its deliberations." (*Id.* at p. 308.) In particular, Mora and Rangel argue the given instruction did not articulate how the delayed discovery affected the defense's presentation of their case by curtailing their ability to subpoena witnesses and requiring they proceed hastily and without adequate preparation during the course of the trial.

Mora and Rangel do not persuade on this point — and the language of the instruction shows why. The trial court conveyed CALJIC No. 2.28 to the jury as follows: "Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence." The jury was informed of the nature of the unfairness wrought by late disclosure, and was told to evaluate the significance to attach to that inequity by considering whether the undisclosed evidence "pertains to a fact of importance, something trivial or subject matters already established by other credible evidence." This language constituted "a proper statement of the applicable law, from

29

which the parties could argue inferences that might (or might not) be drawn from the evidence presented at trial." (*People v. Riggs*, *supra*, 44 Cal.4th at pp. 310–311.) To the extent the instruction permitted the jury to speculate and presume the discovery delay was sufficient — alone — to cast doubt on Mora and Rangel's guilt, the ambiguity favored them.

Mora and Rangel next assert that the court erred by instructing the jury that the Compton Police Department, not the prosecution generally, was to blame for the delayed discovery. As Mora and Rangel note, the prosecution is charged with discovering and disclosing material exculpatory evidence even if maintained by a different agency. (*In re Brown*, *supra*, 17 Cal.4th at pp. 879–883.) There is no indication here that the prosecution failed to do that. The witness statements described in the instruction were not necessarily exculpatory; many of the statements were inculpatory or equivocal. The fingerprint report, to the extent it was exculpatory, was admitted, and its admission occurred over Mora and Rangel's objection.

Even if the evidence was in fact material and exculpatory, and the prosecution was therefore required to discover and disclose it, nothing in the instruction constituted an excuse of the prosecutor's failure to disclose. Rather, the instruction informed the jury of the prosecution agency responsible for the delay in disclosure and invited the jury to accord the necessary weight to that delay. Under section 1054.5, the court may order the noncompliant party to make "immediate disclosure" where only one party fails to comply with the discovery statutes, or the court may initiate "contempt proceedings, delay[] or prohibit[] the testimony of a witness or the presentation of real evidence," or order a continuance. (§ 1054.5, subd. (b).) In addition, "the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." (*Ibid.*) Here, the delayed discovery was immediately disclosed, and the jury received an instruction concerning the delay. These remedies are consistent with the statute. (*Ibid.*) The trial court did not

30

abuse its discretion by providing the modified CALJIC No. 2.28 instruction, which modification included a precise identification of the agency responsible for the delay.

To the extent any error arose from identifying the police department and not the prosecution more broadly as the agency responsible for the delays, the error was harmless under any standard in light of the overwhelming evidence of guilt. (*Neder v. United States* (1999) 527 U.S. 1, 17.) Beltran, Encinas's girlfriend and a witness to the beginning of the altercation, identified both Mora and Rangel from among approximately 11 individuals in a field lineup. Fonseca, the passenger in Beltran's car, also observed the assailants and identified both Mora and Rangel during a field lineup. Gregorio, the passenger in the 4Runner who observed the shootings from the backseat of the vehicle, also identified Mora and Rangel in the field lineup held after the shooting. Lopez told police during interviews that took place immediately after the shooting that Mora and Rangel were both outside when the shooting occurred, that they came back inside one minute after the shots were fired, and that Mora asked Lopez to go to the bedroom where their daughter was sleeping to prevent the child from waking and seeing her father go to jail. Although Lopez testified inconsistently with some of those statements, another party-goer at Lopez's house that night — Valadez — confirmed that Mora and Rangel reentered Lopez's house immediately after the shooting. He also confirmed that both men carried weapons and were bragging about the shootings.

Moreover, Valadez's testimony corroborated other evidence. For instance, Valadez testified that after Mora and Rangel reentered Lopez's house, one of the men stated he would have continued firing shots had his weapon not jammed. One of the two firearms recovered from Mora's Oldsmobile parked in Lopez's garage had a bullet jammed at the breech. Valadez also corroborated Gregorio's observation that Mora was shirtless during the shooting.

Ballistics evidence added further corroboration. The Astra found in the Oldsmobile in Lopez's garage was determined to be jammed due to a feeding problem.

31

Casings recovered from the crime scene compared against those made during ballistics testing revealed that three casings were fired from the Astra. The testing also revealed that an expended cartridge case originated from the Intratec, the other weapon found in the Oldsmobile. The bullet recovered from Encinas's body was shot from the Astra and the bullet recovered from Urrutia's body was shot from the Intratec.

Mora and Rangel's primary defense was mistaken identity, and their defense was refuted by multiple witnesses. Given this overwhelming evidence, there is not a reasonable probability that, had the jury been instructed that the prosecution and not simply the Compton Police Department was responsible for the delayed discovery, the result would have been different. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Likewise, any federal constitutional error resulting from the jury instruction would have been harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

### 3. Closing Argument

Mora and Rangel argue that the trial court erred by prohibiting them from arguing in closing that the discovery delays were intentional. The prosecutor requested that the court restrict Mora and Rangel from arguing that the delays were intentional, and the court agreed, stating "[t]here is no evidence of that. They can't argue intent." The court invited further discussion on the subject, but neither Mora nor Rangel addressed the court's restriction against arguing during the closing that the delay was intentional.

Neither Mora nor Rangel objected to the court's ruling on this matter. So they forfeited the argument that the court erred by prohibiting argument that the delayed disclosure was intentional. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 [concluding timely objection could have prevented harm alleged to have resulted from improper closing argument, and failing to object forfeited the issue on appeal].) Even if not forfeited, the court did not abuse its discretion. The closing argument provides counsel with opportunity to state "what the evidence shows"; it is restricted to the

evidence and reasonable inferences that may be drawn therefrom. (*Ibid.*) Ample evidence supported the court's statement that the delays resulted from negligence, including the fact that the lead police detective handling the case changed during the course of the investigation. Because no evidence of intention was presented, the trial court's restriction was appropriate. Assuming, arguendo, that the court erred by prohibiting defense counsel from arguing that intent could be inferred from the discovery delays, any such error was harmless in light of the overwhelming evidence of guilt. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1407.)

### 2. Rangel's Preparation for Cross-Examining Witness Youngblood

Rangel argues that his right to effective confrontation was violated by the court's failure to provide sufficient time to review a statement John Youngblood gave to Mora's defense team before requiring that Rangel cross-examine Youngblood. There was no error.

#### a. *Background*

On January 28, 1999, the prosecution called John Youngblood to testify. Youngblood was among the several witnesses whose statements to police had been belatedly disclosed to the defense. Youngblood was a Castlegate resident who had heard and observed some of the events in the early morning hours on August 24, 1997. Youngblood saw two men near the 4Runner parked on Castlegate on the morning of the shooting, but he did not identify anyone to the police when he was questioned that day. He later identified Mora from a photo array during an interview with the police.

Before testifying on January 28, 1999, Youngblood provided a six-page statement to Mora's investigator purportedly identifying Rangel, not Mora, as one of the shooters. Following his meeting with Mora's defense team, Youngblood was called to testify. Before the prosecution proceeded with direct examination, Rangel requested additional time to review the six-page statement Youngblood provided to Mora's

33

investigator. The court denied that request. There was just one copy of the six-page statement, which Mora's defense team was reviewing during the prosecution's direct examination of Youngblood. Rangel argued that permitting direct examination before Rangel could review Youngblood's statement constituted a denial of Rangel's right to a fair trial; the court disagreed.

The court explained that Rangel was not legally entitled to a copy of a report prepared by a codefendant's investigator. Moreover, the court noted, Rangel's investigator had ample opportunity over the course of the preceding week to talk to Youngblood. Rangel alleged his investigator attempted to speak to Youngblood during that time, but was unable to do so. Rangel claimed that when his investigator attempted contact, Youngblood told the investigator that police had told Youngblood not to speak with a defense investigator because he did not have to do so. In fact, it appears Youngblood declined to speak with Mora's investigator, not Rangel's. It is not clear that Rangel's team sought to speak with Youngblood. In any event, as the court noted, "it does not matter who [Youngblood spoke to]. The witnesses are entitled to speak to whomever they choose to. They don't have to talk to anybody, and if they do, that's fine." (See *People v. Valdez* (2012) 55 Cal.4th 82, 118 ["although a criminal defendant may ask witnesses to give interviews, witnesses have no legal obligation to grant that request; they may decline to speak with a defendant"].) And Rangel insisted that a defense investigator spoke with Youngblood, and that Youngblood's identification of Rangel as a shooter on the day of Youngblood's testimony was a new development. The court suggested the parties wait to see how the witness examination would "play out" and permitted the prosecution to proceed with direct examination.

Youngblood testified to, among other things, observing the 4Runner under strong lighting in which he could see the back of the man standing at the passenger-side door and the front of the man standing at the driver's side of the car. Youngblood identified

34

Rangel as the man he saw standing at the driver's side. After the shots were fired, Youngblood saw the back of a "car speeding off, going up the street."

Following direct examination, Rangel again complained that there had been no opportunity to review the report given to Mora's investigator. The court declined to take a break, but told Rangel's counsel that she could "stand there and take as much time as [she] need[s]" to read the report. The court noted again that Rangel had "had ample opportunity to interview this witness."[14] In a further effort to accommodate Rangel, the court suggested that Mora cross-examine Youngblood before Rangel. Because Mora was uncertain whether cross-examination was warranted, the court provided a short time to allow Mora to make that determination, giving Rangel's defense team a few additional moments to read the six-page report. Rangel's counsel then announced, "I'm going to try to start" and proceeded to cross-examine Youngblood.

b.      *Discussion*

Rangel argues that his right to effective confrontation was violated by the court's failure to provide his counsel time to review Youngblood's statement before cross-examining the witness. A criminal defendant possesses a fundamental right to confront the witnesses against him. (U.S. Const., 5th, 6th, 8th, 14th Amends.; Cal. Const., art. I, §§ 7, 15, 24; § 686; *Pointer v. Texas* (1965) 380 U.S. 400, 403.) Cross-examination is a cornerstone of that fundamental right. (*Pointer*, at p. 404.) Rangel does not argue that he was entirely denied the right to cross-examine Youngblood, but that his attorney's

---

**14** At this point in the sidebar with the bench, Rangel shifted strategies and told the court Youngblood's rap sheet should be run to determine whether he had prior felony convictions. The court declined to inconvenience the witness further by having the rap sheet run before completing his testimony, although the court and parties agreed that Youngblood would remain on call should the need arise to question him further regarding any prior felonies. The prosecution also agreed to stipulate to any felony conviction in Youngblood's past. Rangel argued, with respect to the court's failure to provide a continuance to review the six-page report and run Youngblood's rap sheet before cross-examination that "this is a denial of Mr. Rangel's right to have a fair trial, due process of law and equal protection." The court did not directly respond to this statement.

inadequate preparation to cross-examine rendered that examination constitutionally deficient. He contends the right to confrontation necessarily means that a defendant possesses the right to "effective" cross examination (*Davis v. Alaska* (1974) 415 U.S. 308, 318 (*Davis*)), and insufficient preparation through no fault of his counsel's rendered the cross-examination ineffective. Rangel is mistaken.

Here, Rangel did have an opportunity to review the six-page witness statement prior to cross-examining Youngblood. Because the statement had been prepared shortly before Youngblood's testimony, neither the prosecutor nor Mora had much time to review the statement. Although the court did not grant a recess, it ensured that Rangel had sufficient time to read the statement before beginning cross-examination. The court initially allowed Rangel time before beginning cross-examination to read the statement, and later granted a short break to allow Mora time to review notes and consider whether to conduct cross-examination first, during which break Rangel was able to thoroughly review the statement. During the break and before Rangel could avail himself of additional time to review the statement, as he could have taken if he allowed Mora to proceed with cross-examination, Rangel's counsel announced she was "going to try to start," after which the cross-examination began. Rangel's argument that there was insufficient time to review the statement, when he took all the time he needed, accordingly fails.

Nor do we see a defect in the cross-examination itself. The confrontation clause guarantees a meaningful but limited right — the opportunity to engage in effective cross-examination, not necessarily cross-examination that satisfies the defendant in any conceivable respect. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1265.) The United States Supreme Court has distinguished between sufficiently *effective* cross-examination and cross-examination *as effective as the defendant wishes*. (*United States v. Owens* (1988) 484 U.S. 554, 559.) No confrontation issue arises when, for example, the defense is able to cross-examine the witness about bias, inattentiveness, or faulty memory

36

— even if an expert testifies regarding his opinion but is unable to recall the reason he formed that opinion. (*Ibid.*)

In *Davis*, the high court examined what constitutes effective cross-examination. A witness on probation for residential burglary under a juvenile court adjudication claimed he observed two men standing by a car on his property where a stolen safe from a bar was later found. (*Davis*, *supra*, 415 U.S. at pp. 309–310.) Although he was a key prosecution witness, the defense was not permitted to inquire into his potential bias by cross-examining him as to his juvenile offense. (*Id.* at p. 311.) The defense attempted to probe the witness's bias, but was unable to challenge the witness's statement that he had never been questioned by law enforcement. (*Id.* at pp. 313–314.) The high court held that the state's "interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." (*Id.* at p. 320.)

Unlike the instant case, the defendant in *Davis* had scant opportunity to probe the witness's potential for bias. (*Davis*, *supra*, 415 U.S. at p. 318.) Here, Rangel had ample opportunity to cross-examine Youngblood, and used it. The cross-examination was nearly twice as long as the direct examination. Rangel questioned Youngblood in depth about the six-page statement Youngblood made to Mora's investigator. Rangel also probed Youngblood's prior identification of Mora and Youngblood's inconsistent subsequent identification of Rangel.

Only when Rangel's examination began covering repetitive ground did the court intervene, suggesting counsel focus questions more narrowly. Rangel then complained to the court about the insufficient time to review Youngblood's statement, and reiterates that concern on appeal. Yet Rangel points to no authority — nor have we found any — suggesting that a defendant is entitled to as much time as he would like to review a witness's statement made to a codefendant's investigator. To the contrary, we have held that so long as a defendant is afforded an opportunity for effective cross-examination, no

37

error results from a cross-examination that does not fully live up to the defendant's expectations. (*People v. Gonzales*, *supra*, 54 Cal.4th at p. 1265.) Rangel's lengthy and thorough cross-examination of Youngblood was apparently effective, and Rangel does not contend there remained any unasked or unanswered query. Rather, Rangel asserts that there is a delta between announcing readiness to "*try to start*" the cross-examination and announcing readiness to actually start the cross-examination. He claims he indicated only the former, which was not indicative of actual readiness. Of course, Rangel could have, and declined to, take more time to review the statement before so announcing. In any event, the difference between the statements — if there is one — is certainly not enough to find the court erred by failing to grant a longer recess. The cross-examination began when Rangel decided it should, and Rangel's inability to identify any avenue of inquiry that was not taken suggests it was effective. Accordingly, Rangel's right to confront Youngblood was not violated.

### 3. Playing Lourdes Lopez's Unredacted Audio Recordings

#### a. *Background*

Mora and Rangel contend the trial court abused its discretion by permitting the prosecution to play unredacted audio tape recordings ("tapes") of Lopez's interview with police. Lopez's trial testimony differed in significant respects from her statements to police made in the immediate aftermath of the shooting. Specifically, in her taped interview, Lopez stated that she saw Mora and Rangel run outside prior to the shooting, after which she heard gunshots and saw the two men run back into her house. She also told police that she saw Mora move his car into the garage and park her car behind his. Finally, she told police that Mora asked her to go to the bedroom "cause I don't want my daughter [to] see me go to jail." Although she was cross-examined regarding those differences, Lopez testified that officers stopped and started the recording of the interview several times to call her names and threaten to remove her daughter from her

38

care if she did not make statements inculpating Mora and Rangel. She also testified that she was tired, hungry, and caring for her uncomfortable child during the interviews.

The prosecution sought to play Lopez's two tape-recorded statements in order to impeach her testimony about her level of discomfort during the interviews, impeach her testimony that the recording was stopped and started, or refresh her recollection as to what point in the interviews the taping was stopped and restarted. Mora and Rangel objected to the tapes being played for the jury because Lopez referenced information about gang membership during the tapes, and the jury was not voir dired regarding gang affiliation issues. In fact, the interview contains just three references to gangs. Only one reference relates to Mora, and none to Rangel. In the single reference to Mora, Lopez responded to a question, "what gang [unintelligible]," with the words "Uhm, Joker," indicating Mora. Lopez was then asked another unintelligible question and responded, "uhm, my friends over there." The court concluded the tape could be played because any linkage to Mora's gang affiliation the jury could discern from that exchange could be resolved via instruction.

Mora and Rangel also objected to the tapes' introduction because they contained hearsay statements and were unduly prejudicial. Specifically, Mora and Rangel alleged that Lopez disclosed that Mora had suffered past incarceration and that she suggested that Mora had a propensity toward violence. The court clarified that the portion of the tape referring to Mora's propensity toward violence had already been read to the jury in the course of Lopez's cross-examination, and that it was less sensible to try and exclude portions of the tape in light of the overall purpose of determining whether and when the taping was stopped and restarted.

The trial court permitted the prosecution to play the tapes. The court also provided a transcript of the tapes to the jurors to follow along as they listened, although the transcript was not admitted into evidence or provided to the jury for deliberation. The

court instructed Lopez to note any instance of the tape being stopped and started.  She was unable to do so.

> b. *Discussion*

Mora and Rangel contend that when the prosecution played Lopez's taped interviews with the police, the trial court abused its discretion in violation of Evidence Code section 352.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1198 ["We review the trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code section 352 . . . for abuse of discretion"].)  Relevant evidence may be excluded if a trial court determines that its probative value is substantially outweighed by the probability that its admission will cause prejudice, delay, confusion, or will mislead the jury.  (Evid. Code, § 352.)  Mora and Rangel argue that the taped interviews were irrelevant because they lacked evidentiary value with regard to proof of guilt or innocence.  Mora and Rangel's formulation of relevance is artificially narrow. " 'Relevant evidence' means evidence, *including evidence relevant to the credibility of a witness* or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210, italics added.)

Here, the tapes were relevant to a key witness's credibility and allegation that her highly inculpatory statements to police made in the immediate aftermath of the shooting were coerced.  (See, e.g., Evid. Code, § 1235 [hearsay rule does not exclude prior statements inconsistent with trial testimony].)  "We will not disturb a trial court's exercise of discretion under Evidence Code section 352 ' "*except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." ' "  (*People v. Jones* (1998) 17 Cal.4th 279, 304.)  The trial court's reasonable admission of the taped statements was none of those things.

40

Mora and Rangel contend the taped statements were highly prejudicial because they contained hearsay statements referencing, among other things, Mora's propensity for violence, gang association, and Mora's previous incarceration. The court's determination that the probative value outweighed any prejudice resulting from the statements was not arbitrary. Indeed, the parties engaged in a lengthy colloquy about the tapes' admission, and the court admonished the jury to disregard any hearsay the taped statements might contain and consider the tapes only in connection with Lopez's allegations regarding coercion. While courts must tread carefully with regard to propensity for violence and gang evidence in light of the inherently prejudicial nature of such information (*People v. Williams* (1997) 16 Cal.4th 153, 193), the court's admission of the taped statements here, with their minimal reference to gangs and little tying gang participation to Mora, Rangel, or the crimes at issue, was not an abuse of discretion. (*People v. Jones*, *supra*, 17 Cal.4th at p. 304.) Because we find no error, we do not address prejudice, although the overwhelming evidence of guilt suggests none would attach even if the court's admission of the statements was erroneous. (See *Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Smith* (2015) 61 Cal.4th 18, 52.)

### 4. Juror No. 7 Was Not Dismissed

Rangel argues that the trial court failed to conduct an adequate inquiry and failed to remove Juror No. 7 in violation of Rangel's rights to due process and a fair trial, trial by an impartial jury, and to a reliable capital and penalty determination. (See U.S. Const., 5th, 6th, 8th, 14th Amends.) Specifically, Rangel alleges the trial court erred by failing to adequately question Juror No. 7. Rangel further argues that the trial court's failure to dismiss Juror No. 7 after the juror learned Mora or Rangel might have rejected a plea bargain was prejudicial. We hold the trial court's examination of Juror No. 7 was adequate and the court did not err by declining to dismiss Juror No. 7 because the juror's

41

exposure to a potential plea was not per se erroneous. Even if error occurred, it was not prejudicial.

a. *Background*

On January 11, 1999, before voir dire, the woman who became Juror No. 7 spoke with a woman in the court cafeteria that she later learned was the mother of Mora or Rangel. The mother asked if she could take the seat opposite Juror No. 7 in the cafeteria and Juror No. 7 replied affirmatively. Juror No. 7 was wearing a juror badge. The mother offered Juror No. 7 a cookie, and Juror No. 7 refused the offer. The mother told Juror No. 7 that she was at the courthouse every day for her son's trial, and confided that "she was sure she was going to lose [her son] because he had been offered a plea of 25 to life," and "she was going to lose out because murder charges—well, charges had been set up and they wanted to give [her son] the death penalty." The mother also confided to Juror No. 7 that she had been looking for a job, but was now unable to continue that search until "this whole ordeal" concluded. The mother did not identify herself or her son to Juror No. 7. Juror No. 7 did not encourage the conversation.

Two days later, after the jury was empaneled and the second day of evidence presentation was underway, Juror No. 7 recognized the mother in the courtroom as the woman who had spoken with her in the cafeteria earlier that week. Juror No. 7 realized the woman must be the mother of one of the defendants. She immediately drew the issue to the court's attention. Juror No. 7 had not raised the issue earlier because she had not previously been aware that the woman with whom she conversed was connected to the trial in which she was a juror. The court and counsel questioned Juror No. 7 out of the presence of the jury. Juror No. 7 stated that the contact she had had with the mother would not impair her ability to evaluate the evidence during the guilt phase to determine whether the People proved the case beyond a reasonable doubt. Juror No. 7 likewise

42

attested that knowing the mother was related to one of the defendants would not influence Juror No. 7 in any way during the penalty phase of the proceedings.

After this colloquy, the court spoke with counsel out of Juror No. 7's presence. The prosecution noted that there never had been an offer of 25-to-life on the table. The court clarified that the issue is not whether an offer had been made, or an agreement reached, but whether the juror could sit. Rangel requested that the juror be excused because, whether or not an offer had been made, the juror believed an offer was declined. Rangel argued that the existence of an offer suggested that Mora, Rangel, or both, had committed the crime for which they stood accused and the juror might have believed the offer should have been accepted. This was particularly true for Juror No. 7, Rangel argued, because her jury questionnaire revealed that she believed that once an individual was found guilty of a capital offense and sentenced to death, that sentence should be "carried out" lest too "much time [be] wasted on the criminals."

Mora did not ask that the juror be removed, but requested that audience members be instructed to refrain from making statements about the case. Rangel echoed the request that family members be admonished "not to have contacts with anybody."

The court denied Rangel's request to excuse Juror No. 7, concluding that the juror properly addressed the issue at the first available opportunity and was "adamant about her ability to set [the conversation] aside." The court noted that "whether there was an offer or not isn't anything anyone can consider." The court noted a death penalty case raised less concern than a case in which the potential sanction would be unknown by the jury.

The court advised all audience members in the courtroom, whether they were there to support the victims or defendants, not to speak to any member of the empaneled jury or the alternates. Finally, the court suggested audience members spread the word to their friends and relatives to refrain from contact with the jury. The court warned that if an audience member was found to have spoken with a juror, that person would be excused from "attending or participating in this proceeding."

43

b.      *Discussion*

Each criminal defendant is entitled to an impartial jury.  (*People v. Mickel* (2016) 2 Cal.5th 181, 215, citing *People v. Earp* (1999) 20 Cal.4th 826, 852.)  That entitlement imposes upon each juror a duty to maintain impartiality throughout the trial. (*People v. Nesler* (1997) 16 Cal.4th 561, 578.)  The loss of impartiality requires dismissal of the juror.  (*Ibid.*)  Loss of impartiality may result from a juror's receipt of information about the case that was not part of the evidence received at trial.  (*Ibid.*)  A jury must be "capable and willing to decide the case solely on the evidence before it," lest a due process violation occur.  (*Smith v. Phillips* (1982) 455 U.S. 209, 217.)

Rangel argues his right to due process was violated by the court's inadequate voir dire following Juror No. 7's revelation that she spoke with Mora or Rangel's mother. "The law is clear . . . that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)  If a juror's ability to perform his or her duty is called into question, a court is expected to hold a hearing; failure to conduct a sufficient hearing constitutes an abuse of discretion.  (*Ibid.*, citing *People v. Burgener* (1986) 41 Cal.3d 505, 519–520.)  Following a hearing, the trial court may discharge a juror if it finds that the juror is unable to perform his or her duty.  (§ 1089.)

We conclude the trial court's hearing concerning Juror No. 7's unwitting contact with the mother was sufficient.  Consistent with its obligation, the trial court immediately investigated Juror No. 7's report that she believed she had contact with a party's relative. Following a thorough examination by the court and parties, the court concluded that Juror No. 7 could perform her duty as a juror and declined to dismiss her.

In claiming the court's examination was inadequate, Rangel alleges only that the court failed to assess the effect, if any, of Juror No. 7's conversation with the mother on the other jurors.  We note at the outset that Rangel was given an opportunity to question Juror No. 7 after the court completed its inquiry, and Rangel failed to raise any questions

44

regarding the impact on other jurors of Juror No. 7's contact with the mother. Rangel did not ask if Juror No. 7 discussed the encounter with any other juror. Assuming Rangel's argument is not forfeited via his counsel's own failure to examine Juror No. 7 as he now claims was compelled, we nevertheless conclude that the trial court did not err by declining to examine the effect, if any, of Juror No. 7's conversation with the mother on other jurors.

A court must hold a hearing if a juror's ability to perform his or her duty is called into question. (*People v. Keenan*, *supra*, 46 Cal.3d at p. 532.) The court did just that here. Only Juror No. 7's ability to objectively serve as a juror was called into question, and the person who raised the question was Juror No. 7 herself. No other juror's ability to impartially serve was in issue. Rangel does not allege that the court was deficient because it should have questioned some or all of the other jurors; of course, the court would have been obliged to do so if any other juror's ability to perform his or her duty had been in doubt. (See *ibid.*) The trial court adequately probed and resolved the question of whether Juror No. 7 could continue to impartiality serve. Indeed, the court commended Juror No. 7's prompt efforts to communicate the potential issue to the court and see it resolved. The court was not obliged to evaluate whether Juror No. 7's conversation affected the other jurors when there was no suspicion that any other juror became unable to impartially serve (or even that another juror became aware of Juror No. 7's conversation with the mother). Accordingly, the court's inquiry into Juror No. 7's ability to impartially perform her duty was adequate, and no error occurred. Even if error occurred, it would not have been prejudicial because there is no substantial likelihood that Juror No. 7 was actually biased. (See *In re Hamilton* (1999) 20 Cal.4th 273, 294–296.)

Rangel also alleges the court erred when it failed to dismiss Juror No. 7. The juror should have been dismissed, contends Rangel, because what was said to her was outside the scope of the evidence presented at trial and constituted error in violation of Rangel's

right to due process. If " 'extraneous material' " presented to a juror, " 'judged objectively, is inherently and substantially likely to have influenced the juror,' " bias may be found. (*People v. Danks* (2004) 32 Cal.4th 269, 303.) Rangel contends that Juror No. 7 was actually biased because she possessed unforgettable information that she was not permitted to consider as a matter of law. That is, Rangel asserts Juror No. 7 knew that a plea agreement was rejected, making Juror No. 7 more likely to infer that Rangel was guilty, and leaving "an inerasable impression" that Rangel, though guilty, decided to take his chances with trial, and should therefore suffer the death penalty if found guilty. (*People v. Lambright* (1964) 61 Cal.2d 482, 486; see *id.* at p. 487.) The refusal of a guilty plea, of course, is not necessarily indicative of culpability and may instead be consistent with a defendant's belief in his innocence or reduced culpability.

Receipt of extraneous information is not " 'misconduct' in the pejorative sense," but it "may require similar examination for probable prejudice." (*In re Hamilton*, *supra*, 20 Cal.4th at p. 295.) If a sitting juror communicates with a non-juror, there arises "a rebuttable 'presumption' of prejudice." (*Ibid.*) The presumption can be rebutted by demonstrating there is "no substantial likelihood that one or more jurors were actually biased against the defendant." (*Id.* at p. 296.) A substantial likelihood of bias may be found where the material was not inherently prejudicial but the totality of the circumstances suggest actual bias arose. (*People v. Danks*, *supra*, 32 Cal.4th at p. 303.)

Precisely what constitutes " 'actual bias' " of a juror may vary somewhat depending on the particular circumstances of the case. (*People v. Nesler*, *supra*, 16 Cal.4th at p. 580.) The United States Supreme Court has explained that bias, or impartiality, is a state of mind rather some specific course of conduct. (*United States v. Wood* (1936) 299 U.S. 123, 145–146.) In assessing whether that state of mind is present or not, the law makes room for a juror's humanity, understanding that a juror may not "be totally ignorant of the facts and issues involved." (*Irvin v. Dowd* (1961) 366 U.S. 717, 722; see also *People v. Nesler*, *supra*, 16 Cal.4th at p. 580.) If a juror is able to

46

set aside impressions and opinions to render a verdict based on the evidence presented in court, the juror is impartial. (*Smith v. Phillips*, *supra*, 455 U.S. at p. 217.) If, on the other hand, the juror forms an opinion so strong that the court is of the belief it cannot be set aside even if the juror does not express it, the juror will be adjudged biased. (*Irvin v. Dowd*, *supra*, 366 U.S. at p. 723; *People v. Nesler*, *supra*, 16 Cal.4th at p. 580.) The evaluation of bias presents a mixed question of law and fact on appeal, the resolution of which obliges this court to review the trial court's examination and the juror's responses. (*Ibid.*)

Here, Juror No. 7 attested to her ability to impartially evaluate the evidence at the guilt phase of the trial. She likewise was certain that what she learned from the mother would not influence her penalty phase decision-making. Noting Juror No. 7's insistence that she could set aside what she was told by one of the defendants' relatives, the court found no reason to remove the juror. Assuming that Juror No. 7's communication with a nonjuror — even though it occurred before Juror No. 7 was empaneled — created a rebuttable presumption of prejudice, there is no substantial likelihood that Juror No. 7 was actually biased against Rangel.

Juror No. 7's responses to the trial court's examination revealed no bias, and the trial court found none. A review of the complete trial record reveals no further conduct on Juror No. 7's part suggesting latent bias. (Cf. *People v. Nesler*, *supra*, 16 Cal.4th at p. 583 [juror repeatedly disclosed outside information about the defendant during deliberation when she disagreed with fellow jurors, suggesting bias].) Juror No. 7 stated she could set aside what she had been told and she proceeded to do so. Accordingly, the trial court did not err by declining to remove Juror No. 7.

### 5.    Accessory After the Fact Instruction

#### a.    *Background*

At the conclusion of the guilt phase, Mora requested that the jury be instructed consistent with section 32, accessory after the fact.[15]  Mora contended that substantial evidence supported his defense theory that Jade Gallegos, not Mora, was one of the shooters.  In support of this theory, Mora asserted that one of the witnesses, Sheila Creswell — who lived on Castlegate across the street from Gallegos and who saw Gallegos daily — witnessed Gallegos and Rangel running away from the 4Runner after she heard shots fired on the morning of August 24, 1997.

The prosecutor opposed Mora's proposed instruction.  In doing so, the People argued that several witnesses had identified Mora and no evidence supported Mora's theory that he served only as an accessory.  The court noted that the instruction Mora requested, accessory after the fact, was a lesser related offense, not a lesser included offense.  Mora argued the instruction was warranted because the jury could conclude that Gallegos was a shooter and Mora simply moved the cars after the shooting.  After taking additional time to research and consider Mora's request, the trial court denied the requested instruction, explaining that it was not warranted under the facts of the case.  Mora's counsel asked if she was permitted to argue that Mora was not guilty because he simply moved the cars, to which the court responded, "of course."  The court clarified that Mora was charged only with murder and attempted robbery, and the jury was free to conclude that Mora was not guilty of either of the charged offenses.  Mora's counsel responded, "thank you," and the discussion concerning this instruction concluded.

---

[15]    Section 32 provides, "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

b. *Discussion*

The parties agree that accessory after the fact is, as the court noted, a lesser related offense to murder, not a lesser included offense. (*People v. Majors* (1998) 18 Cal.4th 385, 408.) A trial court is not obliged to instruct a jury on lesser related offenses even if requested, as Mora concedes. (*People v. Birks* (1998) 19 Cal.4th 108, 112–113 (*Birks*).) Mora argues that *Birks* is distinguishable from the instant case in two respects. First, Mora contends that the failure to instruct here unfairly weights the instructions given in the prosecution's favor, which was not the case in *Birks*. (*Ibid.*) Second, Mora alleges, the trial court's refusal to give the instruction violated his constitutional rights to present a defense, to due process, to a fair trial by jury, and to a reliable guilt determination in a capital trial.

Regarding his first point, Mora cites no authority — nor does he otherwise make a persuasive argument — supporting the conclusion that unfair weighting of instructions in favor of the prosecution permits a trial court to disregard *Birks*. Instead, Mora argues that due process commands "a two-way street" between the prosecution and defense, which extends to jury instructions. (*Wardius v. Oregon* (1973) 412 U.S. 470, 475.) Here, because the prosecution requested and the trial court agreed to give CALJIC No. 2.03 regarding consciousness of guilt, Mora argues that the jury instructions favored the prosecution's theory in violation of due process principles. Again, Mora cites no authority suggesting there must be parity, absolute or otherwise, in giving instructions requested by or favoring a party. Mora has presented no reason to disregard *Birks*; accordingly, we conclude a trial court remains free to decline to instruct the jury on a lesser related offense. (*Birks*, *supra*, 19 Cal.4th at pp. 112–113.)

Mora asserts that CALJIC No. 2.03 erroneously permitted the jury to consider his false statements, if any, to the extent they demonstrated his consciousness of guilt of the charged crimes of murder and robbery, while precluding the jury from determining his guilt of accessory after the fact. Mora is mistaken. We have previously held that

49

declining to instruct on accessory after the fact is "not essential to [a] defendant's defense. Through [a] defendant's testimony and defense counsel's closing argument, the jury [may be] fully apprised of the defense theories that it was [someone else] rather than [the] defendant who caused [the] fatal injuries." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 213 (*Whisenhunt*).)[16] As in *Whisenhunt*, Mora was given an opportunity to, and did, argue that Jade Gallegos was the shooter, and that Mora made false statements to protect Gallegos. (44 Cal.4th at p. 213.) Thus, the jury was able to consider whether Mora was an accessory after the fact. Mora argues that he was entitled to present instructions on his theory of defense, and the trial court's refusal to give an accessory after the fact instruction erroneously deprived him of that right. We considered and rejected this claim in *Whisenhunt* and Mora presents no reason to do otherwise here. (*Id.* at pp. 212–213.) Accordingly, we conclude the trial court did not err by declining to instruct the jury on accessory after the fact.

### 6. CALJIC No. 2.03 Instruction on Consciousness of Guilt

Mora argues that the consciousness of guilt instruction, CALJIC No. 2.03,[17] was unnecessary and argumentative, and claimed it permitted the jury to draw irrational and unjust inferences concerning Mora's guilt. We have consistently rejected similar claims. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 922 (*Covarrubias*) [rejecting challenge

---

**16** Although not discussed in conjunction with the trial court's denial of a requested accessory after the fact instruction, the trial court in *Whisenhunt* also instructed the jury pursuant to CALJIC No. 2.03. We rejected the argument in that appeal that CALJIC No. 2.03 was impermissibly argumentative or allowed the jury to draw irrational inferences. (*Whisenhunt*, *supra*, 44 Cal.4th at pp. 221–222.)

**17** CALJIC No. 2.03, as given regarding Mora only, stated, "If you find that before this trial a defendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

to CALJIC No. 2.03 claiming instruction was unnecessary, argumentative, circular, and permitted the jury to draw irrational inferences]; see also *People v. Holloway* (2004) 33 Cal.4th 96, 142 [jurors likely to indulge inference of consciousness of guilt based upon false statements even absent instruction].)

Mora contends the instruction caused an irrational and unjust inference of guilt because it focused the jury's attention only upon an inculpatory interpretation of the facts, rather than permitting the jury to infer that Mora was merely an accessory after the fact. There is no reason to presume the instruction caused such a focus; as we explained above, the jury can be apprised of the defense theory that another person committed the crime via testimony and closing argument, and need not be given a specific instruction about that theory. (See *Whisenhunt*, *supra*, 44 Cal.4th at p. 213.) As we have repeatedly concluded, an instruction concerning consciousness of guilt does not allow the jury to draw irrational inferences regarding the evidence. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 505.)

### 7. Attempted Robbery Sufficiency of the Evidence

Mora and Rangel contend there was insufficient evidence to have convicted them of attempted robbery. We discern sufficiency by inquiring whether evidence was presented from which a reasonable trier of fact could conclude, beyond a reasonable doubt, that the prosecution sustained its burden of proof. (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) Although we assess whether the evidence is inherently credible and of solid value, we must also view the evidence in the light most favorable to the jury verdict and presume the existence of every fact that the jury could reasonably have deduced from that evidence. (*Id.* at p. 480.)

Attempted robbery requires "a specific intent to commit robbery and . . . a direct but ineffectual act toward the commission of the crime." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) Robbery is defined as "the felonious taking of personal property in the

51

possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Robbery requires the "specific intent to permanently deprive" the victim of his or her property. (*People v. Young* (2005) 34 Cal.4th 1149, 1176; *id.* at p. 1177.)

Mora claims the sole evidence presented to the trier of fact regarding attempted robbery was Gregorio's testimony that both Rangel and Mora asked for the victims' wallets prior to shooting them; Rangel argues no evidence supported the theory that he or Mora intended to take anything from the victims. Gregorio testified that Rangel pointed a gun at Encinas's face while saying, "Check yourself. Check yourself. Give me your wallet." Before he was shot, Encinas had time to briefly verbally respond, "come on, man," and to reach for his wallet. On the other side of the car, at the moment that Encinas reached for his wallet and Rangel shot him, Mora asked Urrutia for Urrutia's wallet. Urrutia told Mora that he had no money but would give Mora his wallet anyway. Immediately thereafter, "within seconds," Mora shot Urrutia. Officer Raymond Brown, one of the first responders to Castlegate, noted that two wallets were visible in the 4Runner. Encinas's wallet was in the center console between Encinas and Urrutia, and Urrutia's wallet was in the passenger seat.

Mora and Rangel argue the evidence was insufficient to demonstrate their intent to permanently deprive the victims of their property. Reviewing the evidence in the light most favorable to the verdict, as we must, we conclude — narrowly — that the record discloses solid, credible, and reasonable evidence of Mora and Rangel's guilt of attempted robbery and of felony murder based on attempted robbery. (*People v. Boyer*, *supra*, 38 Cal.4th at p. 480.) Credible testimony was presented that Mora and Rangel asked the victims for their wallets. As Mora acknowledges, this evidence alone is sufficient to convict a person of attempted robbery "in the appropriate case." Mora argues more evidence was needed here, and no more evidence was adduced. But that is not true. Encinas and Urrutia each were permitted to take steps to comply with the

52

requests for their wallets. Each verbally responded to the requests for their wallets and moved their bodies in an effort to retrieve their wallets to hand to Mora and Rangel before being shot. The wallets were found in open and apparent locations in the 4Runner. From these facts a reasonable jury could conclude that Mora and Rangel intended to deprive the victims of their wallets.

Some evidence cuts in the other direction. The wallets were not taken from the victims. Before asking the victims for their wallets, Rangel asked Encinas whether he wanted to "go to sleep," an exchange that seems unrelated to a permanent deprivation of property. Ultimately, though, whether Rangel and Mora's demands for the victims' wallets alone would have been sufficient to affirm the jury's verdict is immaterial. The jury based its verdict upon all of the evidence, much of which supported the prosecution's theory. In addition to the evidence that defendants asked for the victims' wallets and permitted the victims to take steps acquiescing to their demands, the prosecutor theorized that the murders could have been carried out following the attempted robbery because doing so would guarantee the victims could not give chase to their assailants. Viewing the evidence in the light most favorable to the verdict, we conclude it suffices to demonstrate that Mora and Rangel intended to permanently deprive the victims of their property and each took an overt step toward completing that goal.

Mora urges us to conclude otherwise. He argues that because shots were fired so quickly after defendants asked for the wallets and neither Mora nor Rangel "made any attempt to take the victims' wallets or anything else from either of the victims or their vehicle" after the shooting, they had no intent to permanently deprive the victims of their property. Even if the evidence supported Mora's theory, we are not free to reform the verdict simply because another theory is plausible. (*People v. Jackson* (2016) 1 Cal.5th 269, 345 [" 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be

53

reconciled with a contrary finding' "].)  Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence.  (*People v. Farnam* (2002) 28 Cal.4th 107, 143.)

Even if we find sufficient evidence to support the attempted robbery convictions, Mora and Rangel separately urge us to conclude that the robbery-murder special circumstance must be vacated because there was insufficient evidence to establish that Encinas and Urrutia were killed to advance the independent felonious purpose of robbery. As the opinion of our concurring and dissenting colleague highlights, this is a closer question.  (*People v. Green* (1980) 27 Cal.3d 1, 61 (*Green*).)  In *Green*, we explained that the robbery-murder special circumstance must satisfy the legislative goal of all special circumstances, "provid[ing] a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not," and it cannot do so if "the defendant's intent is not to steal but to kill and the robbery is merely incidental to the murder."  (*Ibid.*; §190.2, subd. (a)(17)(A).)  That is, if the murder furthers the robbery or attempted robbery, the special circumstance is satisfied.  But, if the robbery or attempted robbery simply furthers or facilitates the murder, it is not, because the robbery's "sole object is to facilitate or conceal the primary crime."  (*Green*, *supra*, 27 Cal.3d at p. 61.)

We conclude that sufficient evidence supports the jury's true finding of the robbery-murder special circumstance.  The evidence suggests the robbery was committed for reasons separate and independent from the murder.  The concurring and dissenting opinion points to evidence indicating the primary focus of the encounter between defendants and victims was murder, and certainly there is support in the record for this interpretation.  Rangel asked Encinas if he wanted to "go to sleep," after which Mora and Rangel followed the victims to their car.  Once there, defendants asked the victims for their wallets.  Urrutia and Encinas demurred, with one indicating he did not have much

54

money but would provide his wallet anyway, and the other saying "come on, man" while reaching for his wallet. Moments later, both men were shot.

Yet the record also supports the jury's verdict, in which the robbery-murder special circumstance was found true. Both of the defendants asked the victims for their wallets before they were shot. The prosecutor argued Mora and Rangel shot Encinas and Urrutia to avoid detection, and planned to reach into the car at some later point to take the wallets they had demanded from their victims. The evidence supports this theory as well, suggesting the attempted robbery occurred for reasons other than to "facilitate or conceal" the eventual murders. (*Green*, *supra*, 27 Cal.3d at p. 61.) Defendants' requests for the victims' wallets was inconsistent with the dialogue that had preceded it. After Rangel had asked if Encinas wished to "go to sleep," defendants followed the victims to their car. The conversation then shifted to the wallets. Defendants even provided their victims with some time to respond to the demand for their wallets, engaging in a short dialogue with them about whether the wallets contained money. Defendants allowed Encinas and Urrutia time to remove their wallets and place them in open areas of the 4Runner before finally shooting them. This course of events does not ultimately suggest the attempted robbery was committed as a pretext to conceal the primary crime, murder. (*Ibid.*)

In *Green*, the facts paint a more apparent picture of robbery committed to conceal murder. (*Green*, *supra*, 27 Cal.3d at pp. 51–62.) Before shooting the victim, the defendant instructed her to remove all of her clothing. (*Green*, *supra*, 27 Cal.3d at p. 16.) After shooting the victim, the defendant took the victim's rings and purse, and removed cash from the victim's purse, commenting " '[t]his would have been a hell of a robbery, huh?' " (*Ibid.*) The victim's belongings were later burned or disposed of to avoid identification. (*Id.* at pp. 17, 61–62.) The jury found the defendant guilty of the special circumstance of robbery murder and we reversed. (*Id.* at p. 62.) We concluded that whether the items were taken before or after the victim was killed was of little relevance

55

when, as even the Attorney General conceded, the defendant's primary objective was to remove items from the victim to prevent her subsequent identification.  (*Ibid.*)

We likewise reversed a robbery-murder special-circumstance true finding when the only evidence in support thereof was the fact that the victim was shot and killed in a location where robberies had previously occurred.  (*People v. Morris* (1988) 46 Cal.3d 1, 22.)  There, a witness observed the shooting death of a nude victim at a Long Beach bathhouse and observed the shooter flee the scene into a car.  (*Ibid.*)  On such scant evidence, we could not "say the prosecution sustained its burden of proving beyond a reasonable doubt the killing occurred 'during the commission of a robbery.' "  (*Ibid.*)

This case is not so stark.  The question is certainly close, but there is a great deal more support for the jury's verdict here than there was in *Green* or *People v. Morris*.  The concurring and dissenting opinion concludes otherwise, arguing "[t]he facts do not support a finding that defendants murdered their victims 'in order to advance' a robbery." (Conc. & dis. opn., *post*, at p. 1, quoting *Green*, *supra*, 27 Cal.3d at p. 61.)  On this point we disagree.  The separate opinion highlights some of the facts mentioned above — that defendants shot the victims before the victims fully complied with the demand for their wallets, and fled without the wallets and without an abortive event occurring that would have prevented defendants from taking the wallets.  From this information, the concurring and dissenting opinion concludes there was no evidence that a motive to kill developed from the robbery.  But this interpretation of the evidence, while plausible, is not the view the jury took, does not rule out the jury's conclusion, and is not the one we are compelled to adopt in light of the evidence in this record and the standard of review. Viewing the evidence in the light most favorable to the verdict, we hold a reasonable trier of fact could conclude — and did — that the prosecution sustained its burden of proof. (*People v. Boyer*, *supra*, 38 Cal.4th at pp. 479–480; see also *People v. Carter* (2005) 36 Cal.4th 1215, 1261 ["In reviewing a claim of insufficient evidence as to special circumstance findings, ' " 'we must determine "whether, after viewing the evidence in

56

the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [allegations] beyond a reasonable doubt." ' " [Citation.]' "].)  In light of this standard of review, and our interpretation of the same facts, we find sufficient evidence supports the jury's robbery-murder special-circumstance true finding.

### 8.    Multiple Murder Special Circumstance True Finding

Mora and Rangel contend the jury's multiple murder special-circumstance true finding must be reversed.  They argue the special circumstance may have been found true only if the jury determined that each of them intended to kill the victim he did not shoot.  But, they contend, the jury instructions and facts of the case render it impossible to know whether the jury so found beyond a reasonable doubt, or if it instead found that Mora and Rangel intended to aid and abet the robbery of the victim he did not shoot, which would have been insufficient to support the multiple murder special-circumstance true finding.

The jury was instructed pursuant to CALJIC Nos. 8.80.1, concerning special circumstances generally, and 8.81.3, concerning the multiple murder special-circumstance specifically.  CALJIC No. 8.80.1 instructs, in relevant part, "If you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true as to that defendant *unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill, aided or abetted . . . in the commission of the murder in the first degree*, **or** *with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of attempted robbery which resulted in the death of a human being*."

Mora and Rangel assert that there was ambiguity in CALJIC No. 8.80.1 because it permitted the jury to find true the multiple murder special circumstance even if the jury found only that either appellant acted, with reckless indifference to human life, as a major

57

participant in the attempted robbery of the victim they did not shoot. Mora and Rangel are correct, and we held as much in *Covarrubias*, where we examined the paragraph of CALJIC No. 8.80.1 with which Mora and Rangel quarrel here. (*Covarrubias*, *supra*, 1 Cal.5th at pp. 925–931.) We explained in *Covarrubias* that "this portion of CALJIC No. 8.80.1" was erroneous because it "permitted the jury to find the multiple-murder special circumstance true without finding defendant intended to kill a human being." (*Covarrubias*, *supra*, 1 Cal.5th at p. 929.) Because the same infirmity we identified in *Covarrubias* was also present in the instruction given here, we hold it was error to instruct the jury pursuant to CALJIC No. 8.80.1. (*Ibid.*)

In *Covarrubias*, we concluded "the error was harmless because overwhelming evidence established, and the jury could have had no reasonable doubt, that defendant intended to kill, and that he was an actual killer." (*Covarrubias*, *supra*, 1 Cal.5th at p. 929.) *Covarrubias* involved three shooters and three murder victims, each found with wounds apparently inflicted by defendant as well as by one or both of the other shooters. (*Id.* at p. 930.) Based on the physical evidence, we concluded that the defendant certainly "intentionally and fatally" shot one of the victims. (*Id.* at p. 931.) From this we reasoned that "the record compels the conclusion that the instructional error regarding the multiple murder special circumstance was harmless beyond a reasonable doubt. (See also *People v. Maciel* (2013) 57 Cal.4th 482, 521 [160 Cal.Rptr.3d 305, 304 P.3d 983] [multiple murder special circumstance does not require a finding of intent to kill every murder victim].)" (*Covarrubias*, *supra*, 1 Cal.5th at p. 931.)

The multiple murder special-circumstance instruction given here, CALJIC No. 8.81.3, echoes this requirement. It provides, "To find that the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: A defendant has in this case been convicted of at least one crime of murder of the first degree and one or more crimes of murder of the first or second degree." (CALJIC No. 8.81.3; see also § 190.2, subd. (a)(3).) Although this is not an incorrect statement, as

*Covarrubias* and *People v. Maciel* instruct, it is not complete. Section 190.2, subdivision (a)(3) defines the multiple murder special circumstance as a conviction "of more than one offense of murder in the first or second degree." In *People v. Turner* (1984) 37 Cal.3d 302, 328–329, we added an element to the special circumstance beyond that statutory requirement: intent to kill. We overruled *People v. Turner* in *People v. Anderson* (1987) 43 Cal.3d 1104, 1149–1150, holding "intent to kill is not an element of the multiple-murder special circumstance; but when the defendant is an aider and abetter rather than the actual killer, intent must be proved."

In *People v. Rogers* (2006) 39 Cal.4th 826, 891, we examined the propriety of a multiple murder special circumstance instruction. The crime in *Rogers* took place after we issued our decision in *People v. Turner* (in which we required a finding of intent) and before our decision in *Anderson*. We explained there that, under *Anderson*, intent is not an element of the multiple murder special circumstance unless the defendant is not the actual killer but is instead an aider and abettor, in which case intent must be established. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 891.) Because the crime in *People v. Rogers* predated our decision in *Anderson*, however, we explained the jury was required to find intent to kill for at least one of the murders. (*Ibid.*) But, "we explained: 'We have never held that the multiple-murder special circumstance requires a jury to find the defendant intended to kill every victim.' " (*Ibid.*, quoting *People v. Dennis* (1998) 17 Cal.4th 468, 516.) We affirmed this concept recently in *People v. Maciel*, *supra*, 57 Cal.4th at p. 521.

From this line of cases, a principle emerges: to find true the multiple murder special-circumstance allegation, a jury must find that the defendant has been convicted of at least two counts of murder, at least of one which must be first degree murder, and that the defendant either actually killed or intended to kill at least one of the victims. (See § 190.2, subd. (a)(3); *Covarrubias*, *supra*, 1 Cal.5th at p. 931; *People v. Maciel*, *supra*, 57 Cal.4th at p. 521.) Although nothing so clear was conveyed to the jury here, the essence of this instruction was tucked into the many directives bundled into CALJIC

59

Nos. 8.80.1 and 8.81.3.  CALJIC No. 8.81.3 was not incorrect, but it was incomplete.  CALJIC No. 8.80.1 correctly instructed the jury that the multiple murder special circumstance could be found true if defendants were the actual killers or if they intended to kill.

Of course, CALJIC No. 8.80.1 also contained instructional error because it improperly permitted the jury to find the multiple murder special circumstance true if it found defendants acted with reckless indifference to human life as major participants in an attempted robbery — in the alternative to concluding defendants intended to or actually killed one of the victims.  (See *Covarrubias*, *supra*, 1 Cal.5th at p. 929.)  As we explained in *Covarrubias*, "an instructional error in this context is harmless under *Chapman* however, 'when, beyond a reasonable doubt, it did not contribute to the verdict.'  [Citation.] . . . [T]his standard may be met when we are able to conclude that the jury necessarily found an intent to kill under other properly given instructions, or when evidence of the defendant's intent to kill is overwhelming and the jury ' "could have had no reasonable doubt" that the defendant had the intent to kill.' "  (*Covarrubias*, *supra*, 1 Cal.5th at p. 929.)  In *Covarrubias*, we concluded that defendant both intended to kill and was an actual killer.  (*Ibid.*)  But we need not find both to be true.  Pursuant to the multiple murder special circumstance standard previously articulated, it is sufficient that we find Mora and Rangel were each the actual killer of one victim and that they were convicted of more than one count of murder, at least one of which was first degree.  The jury necessarily found each defendant actually killed the victim he shot, and it convicted each defendant of two counts of first degree murder.  The evidence supporting the jury's true finding of the multiple murder special-circumstance is overwhelming.  So we hold the instructional error was harmless.  (See *ibid.*)

60

### 9. First Degree Murder Instructional Error

Mora and Rangel contend that the first degree felony murder and malice-murder instructions were erroneous, and their convictions must be reversed, because the information charged them only with second-degree malice-murder pursuant to section 187. They argue that it was therefore error to instruct the jury that it could convict of the uncharged crime of first degree murder. They further argue that their convictions violate *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), which prohibits conviction of uncharged crimes. This court has repeatedly rejected identical arguments, and neither Mora nor Rangel provide a reason to depart from our long-established rule. (*People v. Friend* (2009) 47 Cal.4th 1, 54 [rejecting instructional error claim that first degree murder conviction is inconsistent with malice murder charge under section 187 and rejecting *Apprendi* error claim because the conviction is not of an uncharged crime]; see also *People v. Hughes* (2002) 27 Cal.4th 287, 369 ["accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely"].)

### 10. Proof Beyond a Reasonable Doubt Instructional Error

According to Mora and Rangel, a series of guilt phase instructional errors singly or cumulatively impermissibly undermined their right to have guilt determined beyond a reasonable doubt in violation of the principles of due process, fair trial, trial by jury, and the fundamental requirement of reliability in a capital case. Mora and Rangel acknowledge that this court has repeatedly rejected identical claims, and they raise no argument that we have not considered. Accordingly, we again conclude that CALJIC Nos. 2.01 and 2.02 do not undermine the proof beyond a reasonable doubt standard, and CALJIC Nos. 2.21.1, 2.21.2, 2.22, 2.27, and 8.20 do not dilute the reasonable doubt standard. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028.)

61

### 11.    Juror Unanimity Regarding Theory of First Degree Murder

Mora and Rangel argue the trial court erred by failing to require that the jury unanimously agree on a theory of first degree murder before returning guilty verdicts for that crime.  As they acknowledge, this court has repeatedly rejected similar claims. (See *People v. Nakahara* (2003) 30 Cal.4th 705, 712–713; see also *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479.)  Mora and Rangel posit that recent United States Supreme Court case law warrants our reconsideration of this precedent, but rely on the high court's nearly twenty-year-old decision in *Apprendi*, *supra*, 530 U.S. 466.  We have far more recently affirmed our long-standing rule that juror unanimity regarding the theory of first degree murder is not required.  (See *People v. Grimes* (2016) 1 Cal.5th 698, 727–728.) Indeed, over a decade ago, we concluded that there is "nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder." (*People v. Nakahara*, *supra*, 30 Cal.4th at p. 713.)  Mora and Rangel present us with no reason to depart from the settled authority on this issue.

### 12.    Attempted Robbery Pinpoint Instructional Error

Rangel argues the trial court erred by denying his request to provide the jury with a pinpoint instruction regarding attempted robbery.  We hold, for reasons addressed below, that the trial court did not abuse its discretion by denying the requested instruction as duplicative.

#### a.    *Background*

At the conclusion of the guilt phase, Rangel requested that the court give a pinpoint instruction concerning the crime of attempted robbery as it related to the charge of felony murder.  Specifically, appellant requested that Special Instruction No. 1 be

given, essentially seeking to instruct the jury that a nonhomicidal felonious intent must exist to support a felony murder conviction.[18]

Rangel's requested instruction was based on this court's holding in *People v. Sears* (1970) 2 Cal.3d 180, 187–188. In *People v. Sears*, the defendant entered his wife's home with a concealed tire iron, assaulted his wife, mother-in-law, and stepdaughter with that and other weapons, and killed his stepdaughter. (*Id.* at pp. 183–184.) The jury was instructed concerning first and second degree murder, felony murder during the commission of a burglary, and on the lesser included offenses of attempted murder and assault with a deadly weapon. (*Id.* at p. 184–185.) During deliberations, the jury asked the court whether assault against the defendant's wife constituted a felony regardless of his intent when he entered the home and, if so, whether first degree felony murder applied. (*Id.* at p. 185.) The court responded by stating the " 'the specific intent to commit the assault must exist at the time of entry, otherwise the felony-murder rule does not apply.' " (*Ibid.*) The jury found the defendant guilty of the first degree murder of his stepdaughter and the attempted murders of his wife and mother-in-law, fixing the penalty at death. (*Id.* at p. 182.) We reversed the defendant's conviction, holding that the court's instructions and answer to the jury's question constituted prejudicial error because burglary based upon the intent to commit an assault with a deadly weapon cannot support a felony murder instruction as that assault is included within the murder charge itself. (*Id.* at p. 188.) We explained that the felony murder rule exists to deter the negligent or

---

**18**     In its entirety, Special Instruction No. 1 stated, "To prove the felony murder of first degree murder, the prosecution must prove beyond a reasonable doubt that the attempted robbery was done for the independent purpose of committing the felony rather than for the purpose of committing the homicide. [¶] If the defendant's primary purpose was to kill or if he committed the attempted robbery to facilitate or conceal the homicide, then there was no independent felonious purpose. If from all the evidence you have a reasonable doubt that the defendant committed the attempted robbery for such independent felonious purpose, you must find the defendant not guilt[y] on the felony murder theory."

accidental killings that may result from the commission of a felony. (*Id.* at p. 187.) The felony murder rule does not deter a person who intends to enter a building and commit an assault. (*Ibid.*)

The trial court declined to instruct the jury as Rangel requested. The court explained that the "import of [*People v. Sears*] is included in [CALJIC No.] 8.21," which, combined with CALJIC No. 8.27 "covers the issue." CALJIC No. 8.21, as given, provides, "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime of robbery is murder of the first degree when the perpetrator had the specific intent to commit that crime. [¶] The specific intent to commit robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." The jury was also instructed pursuant to CALJIC No. 8.27,[19] addressing aider and abettor liability, and underscoring that the intent to commit the underlying felony must be present at the time the killing occurs. Because the jury was instructed with CALJIC Nos. 8.21 and 8.27, the court reasoned that instructing the jury pursuant to Rangel's requested pinpoint instruction would be duplicative.

---

**19** CALJIC No. 8.27, as given, states, "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of attempted robbery, all persons who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advise its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental. [¶] In order to be guilty of murder, as an aider and abettor to a felony murder, the accused and the killer must have been jointly engaged in the commission of the attempted robbery at the time the fatal wound was inflicted. However an aider and abettor may still be jointly responsible for the commission of the underlying attempted robbery based upon other principles of law which will be given to you."

b. *Discussion*

Rangel argues that his requested instruction should have been given to aid the jury's determination of whether Rangel had an independent felonious intent to commit robbery. A proper pinpoint instruction must be given at a defendant's request. (*People v. Hughes*, *supra*, 27 Cal.4th at p. 361, quoting *People v. Earp*, *supra*, 20 Cal.4th at p. 886.) The jury must be instructed on general principles " ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case" ' " including those instructions that "pinpoint" a defense theory. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) Pinpoint instructions are not warranted, however, when they are argumentative, such as when requested only to highlight particular evidence. (*People v. Hughes*, *supra*, 27 Cal.4th at p. 361.) Pinpoint instructions may also be refused if, among other reasons, the proposed instruction is duplicative. (*People v. Hovarter*, *supra*, 44 Cal.4th at p. 1021.)

Because Rangel's proposed instruction would have been duplicative, we conclude the trial court did not err by denying Rangel's request. (See *People v. Hovarter*, *supra*, 44 Cal.4th at p. 1021.) The trial court correctly concluded that the proposed instruction's content was adequately conveyed by CALJIC Nos. 8.21 and 8.27. The jury was instructed that a felony murder conviction, either directly or under an aider and abettor theory, required as a predicate that Rangel committed robbery or attempted to do so. The jury was also instructed that robbery required the specific intent to deprive the victim of property. With the robbery and felony murder instructions given, the jury was adequately instructed that Rangel must have possessed the intent to commit robbery at the time of the killing to be guilty of felony murder, just as Rangel's requested instruction would have conveyed. Indeed, Rangel's requested instruction expressly stated that first degree felony murder required proof "beyond a reasonable doubt that attempted robbery was done for the independent purpose of committing the felony rather than for the purpose of committing the homicide." The jury received precisely this instruction, albeit in slightly

65

different language. The content of the instruction was adequately conveyed to the jury, and no error flowed from the court's decision to decline Rangel's request.

### 13. Cumulative Guilt Phase Error

Mora and Rangel contend reversal is warranted because of the cumulatively prejudicial effect of guilt phase errors. To the extent any errors occurred, none were prejudicial. We conclude no error in the guilt phase, whether considered singly or cumulatively, merits reversal. (See *People v. Souza* (2012) 54 Cal.4th 90, 139 [a few nonprejudicial instructional errors do not warrant reversal on cumulative error claim].)

### B. Penalty Phase

### 1. Gang Evidence

Mora and Rangel argue that introduction of evidence concerning their membership or participation in a criminal street gang at the penalty phase of their trial constituted error in violation of their state and federal constitutional rights. We hold the trial court did not abuse its discretion in permitting limited introduction of gang affiliation evidence.

#### a. *Background*

The prosecutor asserted at the outset of trial that no gang evidence was anticipated. Specifically, before the court conducted voir dire, the prosecutor was asked whether there was "any gang evidence that you will elicit in this case," to which the prosecutor replied, "not that I know of." Because no evidence was expected to be adduced concerning gang affiliation, defense counsel decided against conducting voir dire of potential jurors regarding their views on gangs or gang membership. Immediately prior to presenting her first witness, the prosecutor was again asked whether she planned to elicit testimony regarding defendants' gang affiliation. The prosecutor indicated she had no intent of so doing. Witnesses were admonished not to mention Mora or Rangel's gang affiliation. The court stated it had no "problem excluding gang [evidence] but if it looks like we can't go any other way, then I ask that we approach." The parties agreed, even though no

66

such discussion was required until the penalty phase. At that time, the court and parties held a brief colloquy to address the admissibility of gang evidence as to Rangel, and the court ruled the evidence admissible.

### 1.    Mora

At the penalty phase, the prosecutor stated her intent to present evidence that Mora was involved in an assault in county jail in 1996, where he was incarcerated for a Vehicle Code infraction two years prior to the penalty phase of this trial. Mora requested that no mention of gang activity be made concerning Mora during the penalty phase. After confirming with the prosecutor that no such evidence was expected, the court stated there would be "no gang evidence as it relates to Mr. Mora."

In 1996, Paul Juhn, an inmate in county jail, was assaulted by four or five fellow inmates. Juhn identified the assailants immediately following the attack, but was no longer able to make identifications at the time of Mora's trial. Accordingly, Deputy Sheriff Kresimir Kovac, who was with Juhn when he identified his assailants, testified that the incident report indicated Mora was one of those who Juhn identified. Kovac's report noted that Mora had a tattoo on his chest that said "King City Criminals." The parties and court agreed that Kovac could identify Mora by this tattoo in court if Kovac was unable to visually identify him. Mora initially objected to an identification via his tattoo, and offered to stipulate that Kovac contacted Mora in connection with Juhn's assault. The prosecutor declined the stipulation, and the court ruled that if Kovac could not identify Mora, Kovac could view Mora's tattoo out of the presence of the jury and identify him in that fashion without informing the jury regarding the subject of the tattoo.

Kovac could not identify Mora, but testified that the incident report named Mora and listed information about Mora's chest tattoo. After viewing Mora's tattoo out of the presence of the jury, Kovac testified that Mora had the same three-word phrase tattooed on his chest as was written in the incident report. The court precluded Kovac from telling

67

the jury what the three words were, ruling that the prejudicial effect of that evidence outweighed its probative value. Kovac testified that when identifying suspects in reports, he typically noted information regarding unique identifiers like tattoos, including ones "that show[] a gang name, gang affiliation, anything like that." No objections followed this testimony.

Later in the proceedings, Mora requested that the prosecutor refrain from making references in closing that Kovac testified that Mora had a gang tattoo or that Kovac was looking for a gang tattoo. The court readily agreed, explaining "there can't be" closing argument along those lines because "[t]here is no evidence to support that."

### 2. Rangel

In aggravation at the penalty phase, the prosecutor stated her intent to present evidence that Rangel suffered a felony automobile burglary conviction. Over defense's inaccurate objection that the conviction was actually a misdemeanor, the evidence was ruled admissible. Specifically, the prosecution intended to — and did — adduce evidence that Rangel spray-painted the letters "KCC" on the top of a car and, when confronted by the vehicle's owner, Rangel threatened to kill the owner if he went to the police. The prosecutor introduced evidence that "KCC" stood for "King City Criminals," a street gang, and Rangel's threat to the burglary victim was heightened in light of Rangel's gang affiliation. The vehicle owner testified that after Rangel spray painted "KCC" on the top of his car and threatened to kill him, the owner made it a point to move to a new home before Rangel was released from jail.

During the mitigation phase, Rangel presented testimony from Jose Jimenez, an acquaintance of Rangel's via a Bible study group, who testified that the murder charge seemed out of character for Rangel. The prosecutor argued, and the court agreed, that this testimony opened the door to permit inquiry as to whether Rangel's gang membership was consistent with Rangel's character in Jose's opinion. The prosecutor

68

asked Jose if he knew Rangel was a gang member, and Jose responded that he "never perceived [Rangel] as a gang member." Although Jose testified that he would not be surprised to learn Rangel was a gang member, Jose did not know or believe Rangel to be so affiliated. Jose conceded he would find it surprising to learn that Rangel spray-painted the letters "KCC" on a car, and Jose had not seen that side of Rangel.

Following the mitigation phase, the prosecution presented a rebuttal expert witness to testify further about street gangs. The expert testified that many gang members are known by nicknames or monikers. The expert noted that gang members are often identified by their shaved hairstyles and tattoos. Based on Rangel's tattoos and hairstyle, the expert testified that Rangel was a "gang member of a hard-core nature" with a "wanton disregard or disrespect for life itself." Rangel requested a limiting instruction that gang membership is not a crime and cannot be considered an aggravating factor. The court denied the request, although the prosecution was instructed not to argue about the gang evidence in closing.

b. *Discussion*

Nearly all of Mora and Rangel's claims of error are forfeited because they failed to object on the grounds specified on appeal. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 819 (*Gutierrez*).) Had Mora and Rangel properly preserved these claims, no error occurred in admitting this evidence.

Mora first contends that Kovac's testimony impermissibly implied that Mora was a gang member, and the trial court erred by admitting that evidence-by-implication without carefully scrutinizing whether it was more than tangentially relevant. (See *People v. Gurule* (2002) 28 Cal.4th 557, 653 (*Gurule*).) Mora failed to object on this basis during his trial and has forfeited the claim on appeal. (*Gutierrez*, *supra*, 45 Cal.4th at p. 819.) Even if he had not, Mora's objection to testimony that the lineup procedure following Juhn's attack was designed to protect Juhn from Mora "or from one of his

other gang members that he knows," cannot be understood to imply Mora's gang membership. Kovac testified about the jail lineup process generally, explaining that victims are asked to identify assailants from behind a door or screen because "[i]f somebody . . . identifies an attacker or something like that, there is a real threat of retaliation from that individual, the suspect, *or from one of his other gang members that he knows*." Kovac was not testifying about Mora specifically when making the statement to which Mora now objects.

We review a trial court's evidentiary rulings for abuse of discretion. (*Gutierrez*, *supra*, 45 Cal.4th at p. 819.) Such abuse will be found where a court acts unreasonably given the circumstances presented by the particular case before it. (*Id.* at pp. 819–820.) It was not unreasonable for the trial court to permit the introduction of Mora's "other crimes" evidence at the penalty phase, and the scant reference to gangs during that testimony does not alter our conclusion. (See *People v. Tully* (2012) 54 Cal.4th 952, 1027 [no abuse of discretion found when admitting "other crimes" evidence at penalty phase where evidence was legally sufficient].) No evidence was adduced concerning Mora's gang affiliation; the court carefully shielded the jury from that information. Although heightened scrutiny is warranted where gang evidence is concerned (*Gurule*, *supra*, 28 Cal.4th at p. 653), no gang evidence was introduced in connection with Kovac's testimony regarding the jail lineup process. There is no particular court ruling to review because Mora interposed no objection following the testimony about which he now complains, and we find the trial court's general admission of evidence in aggravation was not unreasonable or an abuse of discretion. (*Gutierrez*, *supra*, 45 Cal.4th at pp. 819–820).

Mora next argues that Kovac's testimony identifying Mora in the Juhn assault was irrelevant and inadmissible. Mora so contends because he offered to stipulate that Mora's name was in Kovac's incident report. This argument is unavailing. The offered stipulation and Kovac's testimony differed. The presence of an individual's name in an

70

incident report is not equivalent to testimony identifying the individual as involved in the incident. Had the presence of the name been sufficient, Kovac could have testified simply that the incident report named Mora without undertaking the additional step of identifying Mora by visually matching Mora's chest tattoo with the tattoo described in the report. Mora argued his proposal constituted an offer to stipulate to an element of a charged offense and the prosecutor was obliged to accept it to the exclusion of presenting evidence. (See *People v. Bonin* (1989) 47 Cal.3d 808, 849.) Not so. The stipulation offered by Mora was inadequate to fully identify Mora, and Kovac's testimony was necessary. Accordingly, no error resulted from the admission of Kovac's identification of Mora.

Rangel's contentions, likewise, fail to persuade. Rangel argues, as did Mora, that evidence of his membership in the KCC gang, while extremely prejudicial, was only tangentially relevant and should have been excluded after careful scrutiny under *Gurule*. (*Gurule*, *supra*, 28 Cal.4th at p. 653.) Rangel did not object on this basis during trial and the claim is forfeited on appeal. (*Gutierrez*, *supra*, 45 Cal.4th at p. 819.) Even if prejudicial, gang evidence of the type introduced here is relevant pursuant to section 190.3, under which the jury may consider past criminal behavior involving violence or threats of violence. The circumstances of those past crimes, including gang membership, may be disclosed to the jury. (*Gurule*, *supra*, 28 Cal.4th at pp. 653–654.)

Rangel spray-painted the letters "KCC" atop a car and threatened to kill the car's owner if he reported the crime to the police. Because Rangel was known by the victim to be a gang member, that threat had particular potency. The past criminal threat of violence was relevant and admissible pursuant to section 190.3. Thus, the trial court did not act unreasonably in an abuse of its discretion by admitting evidence related to Rangel's gang affiliation as it pertained to the vehicle burglary offense. (*Gurule*, *supra*, 28 Cal.4th at pp. 653–654.)

Rangel also claims the trial court erred by admitting evidence of his gang membership during mitigation witness Jose's testimony. Again, Rangel's claim of error is forfeited on appeal because he did not object on this basis at trial. (*Gutierrez, supra*, 45 Cal.4th at p. 819.) Assuming, arguendo, that the claim is not forfeited, we conclude there was no error.

When a defendant places his or her character in issue during the penalty phase, the prosecution may introduce contrary character evidence. (*People v. Loker* (2008) 44 Cal.4th 691, 709.) The prosecution only needs to have a good faith belief that the incidents or conduct about which it inquires actually occurred. (*Ibid.*) The prosecutor had more than that here; after Jose testified to Rangel's good character, the prosecutor asked Jose about Rangel's past criminal offense. Specifically, the prosecutor asked Jose if he would be surprised to learn that Rangel spray-painted the letters "KCC" on the top of a car, an incident the prosecutor had a good faith belief that it occurred in light of the prior testimony to that effect. This evidence was related to the allegations of Rangel's good character and was thus admissible. (*Id.* at pp. 709–710; see also *People v. Fierro* (1991) 1 Cal.4th 173, 239–240 [evidence of a defendant's good character opened door to evidence of his participation with youth gangs].) Similarly, no error flowed from the prosecution's eliciting testimony that Jose would not have been surprised to learn that Rangel was in a gang because that testimony followed Jose's testimony to Rangel's good character. (*People v. Loker*, *supra*, 44 Cal.4th at p. 709.)

Finally, both Mora and Rangel argue that because the jury was not voir dired regarding gangs, references to gang membership during the penalty phase constituted error. We find otherwise. Although the prosecutor stated at the outset of trial that she did not believe gang evidence would be adduced, Mora acknowledged the possibility that some gang evidence could "slip[] out." During trial, the court reminded defense counsel that declining to conduct voir dire regarding gang issues "was a tactical decision." As we have explained in a slightly different context, "[d]efense counsel are routinely faced with

72

difficult tactical decisions in having to fashion voir dire inquiries that probe for possible penalty phase biases regarding such evidence, while stopping short of revealing information otherwise prejudicial and excludable in the guilt phase." (*People v. Ray* (1996) 13 Cal.4th 313, 357.)

The prosecutor never made any guarantee that she would avoid introducing gang evidence. And while defense counsel avoided addressing such evidence during voir dire, that choice did not impose on the prosecution any obligation to refrain from introducing such evidence at trial. The parties agreed to engage in a colloquy if it appeared the prosecution wished to introduce gang evidence. The prosecutor did exactly that during the penalty phase prior to introducing evidence of Rangel's gang membership in connection with the relevant and admissible character and past crimes evidence. Gang evidence was inextricably intertwined with the circumstances of Rangel's prior offense. Defense counsel's early tactical decision to avoid gang voir dire was made with full awareness of the possibility that some gang evidence could be introduced, and its eventual introduction does not transform that tactical choice into error. (See, e.g., *People v. Horton* (1995) 11 Cal.4th 1068, 1123–1124 [counsel's tactical decision to avoid voir dire on sensitive subject did not render assistance ineffective]; see also *People v. Hinton* (2006) 37 Cal.4th 839, 876 [counsel's " ' "reasonable, if difficult, tactical decisions" ' " are accorded deference and must not be second-guessed on appeal].) Having found no error in the introduction of gang evidence in the penalty phase, it follows that no prejudice resulted.

### 2. Instructional Error

Mora and Rangel raise a host of instructional error claims, each of which this court has previously rejected. Mora and Rangel requested the jury be instructed that regarding death as a less severe penalty than life would constitute misconduct, which the trial court refused. As this court has consistently concluded, a trial court's refusal of this special

instruction does not constitute error, especially because " ' "the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty." ' " (*People v. Contreras* (2013) 58 Cal.4th 123, 170.)

Mora and Rangel also requested the jury be instructed that drug or alcohol intoxication constitutes a mitigating factor only, not an aggravating factor. The court declined to give this proposed instruction to avoid confusing the jury. As Mora and Rangel acknowledge, there is no requirement to specify which factors are aggravating and which are mitigating. (*People v. Farnam*, *supra*, 28 Cal.4th 107, 191.) They contend that the issue was confused by the prosecution's argument and court's agreement, outside the presence of the jury, that intoxication could be considered as a circumstance of the offense in aggravation under section 190.3, subdivision (a). Even if this colloquy was ambiguous or incorrect, it did not occur before the jury and could not have created any misunderstanding. Furthermore, pursuant to section 190.3, subdivisions (a) and (h), respectively, the jury was instructed to consider in determining the appropriate penalty "[t]he circumstances of the crime" and "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct . . . was impaired as a result of . . . intoxication." Although Mora and Rangel argue that reasonable jurors would have been unable to understand whether to consider intoxication as a mitigating or aggravating factor, there is no reason to believe this is so. We therefore conclude no error resulted from the court's refusal to give the special instruction concerning intoxication. (See *People v. Osband* (1996) 13 Cal.4th 622, 706 [no error found in court's refusal to give special instruction that intoxication under section 190.3, subdivision (h) could only be considered in mitigation].)

Next, Mora and Rangel contend that the court erred by refusing a special instruction that evidence of their backgrounds could only be considered in mitigation. This court has repeatedly rejected similar claims. (*People v. Hinton*, *supra*, 37 Cal.4th at

74

p. 912.) In particular, this court has rejected the notion that a jury instruction should identify particular aggravating or mitigating evidence. (*Ibid.*) As in *People v. Hinton*, because the jury was correctly instructed concerning factors in aggravation and mitigation, the court did not err by refusing the special instruction. (*Ibid.*)

Mora and Rangel also argue that the trial court improperly rejected three proposed instructions that would have clarified the penalty weighing process. This court has repeatedly rejected similar arguments, as Mora and Rangel note, because CALJIC No. 8.88[20] " 'accurately describes the individualized, normative nature of the sentencing determination, and properly guides the jury's discretion in this regard.' " (*People v. Cage* (2015) 62 Cal.4th 256, 291, quoting *People v. Contreras*, *supra*, 58 Cal.4th at p. 170.)

Finally, Mora and Rangel contend that the court erred by declining to give special instructions limiting the jury's consideration of victim impact evidence.[21] As Mora and Rangel acknowledge, this court has rejected similar challenges to a trial court's rejection of the identical instructions[22] proposed here. (*People v. Zamudio* (2008) 43 Cal.4th 327, 368 [finding no error in trial court's refusal to give instruction identical to the one Mora proposed].) Out of an abundance of caution, the court added a sentence to CALJIC

---

[20] On the court's own motion, the jury was instructed pursuant to CALJIC No. 8.88.

[21] Mora raises this instructional error argument in the context of his numerous claims of similar error, while Rangel raises it in connection with his argument that the "circumstances of the crime" language in section 190.3, subdivision (a) is unconstitutionally vague and overbroad. The remainder of Rangel's argument regarding the constitutionality of section 190.3, subdivision (a) is discussed in section II.B.4., *post*.

[22] Rangel's requested special instruction stated, "Evidence has been introduced for the purpose of showing specific harm caused by the defendant's crime. Such evidence, if believed, was not received and may not be considered by you to divert your attention from your proper role of deciding whether the defendant should live or die. You must face this obligation soberly and rationally, and you may not impose the ultimate sanction as a result of irrational, purely subjective response to emotional evidence and argument." Mora's requested special instruction added a sentence to the end of the foregoing, stating, "On the other hand, evidence and argument on emotional though relevant subjects may provide legitimate reasons to sway the jury to show mercy."

No. 8.84.1, instructing the jury that they "must face [their] obligation soberly and rationally and . . . not [*sic*] a purely subjective response to emotional evidence." Neither Mora nor Rangel contend the addition of this language constituted error, but only that it was not sufficient to cure the error flowing from the court's refusal to give the requested special instructions. We disagree. The substance of the proposed instruction was adequately conveyed by the modified version of CALJIC No. 8.84.1 given by the court. No error resulted from the court's refusal to provide it. (*Ibid.*) Moreover, as we concluded in *People v. Zamudio*, *supra*, "the requested instruction is misleading to the extent it indicates that emotions may play no part in a juror's decision to opt for the death penalty." (*Ibid.*) Because the proposed special instruction was redundant and misleading, the court's refusal to give it did not constitute error. (*Ibid.*) With no error in need of cure, Mora and Rangel's claims that the augmentation to CALJIC No. 8.84.1 was insufficient fails.

### 3. Continuance Request

Rangel contends the trial court abused its discretion and violated his constitutional rights to due process, to a fair trial, to present a defense, to equal protection, to a reliable penalty phase, and to the effective assistance of counsel by denying a continuance. A continuance was essential, he argues, because it would have allowed him to determine whether to present a surrebuttal witness, and denying a continuance postponing closing argument. We conclude the court's denials of these continuances were proper.

#### a. *Background*

After the prosecution presented gang expert evidence, the court asked if Rangel intended to present a surrebuttal witness. Rangel sought a continuance to decide whether to do so, which the court denied. Rangel objected, and the court inquired if any witness was contemplated. Rangel replied, "Possible." Upon the court's request for greater specificity, Rangel indicated he "might" call his father, Ruben Gomez Rangel, who was

76

not then present in court. The court provided Rangel two and one-half hours to contact Ruben and secure his presence at court, and to provide an offer of proof regarding Ruben's testimony to ensure it would constitute appropriate surrebuttal material. The court noted it was "not making any promises." Rangel did not contact Ruben during the two and one-half hours, but planned to contact Ruben that evening and requested a recess to do so. Over objection, the recess was denied.

The court was ready to begin Rangel's closing penalty phase argument at around 3:50 p.m. that day. Noting the time, Rangel expressed concern that the jurors would be tired and the closing argument would be rushed. The court promised that there would be time enough to complete the argument, and agreed to stay in session past the 4:30 p.m. adjournment time if needed. When Rangel again balked because jurors would be fatigued and would likely wish to go home at that time, the court noted that the jurors had been attentive thus far and had had a relatively short court day in light of the many discussions that took place outside the presence of the jury. Over objection, the court declined to recess. Rangel's closing argument began at 3:55 p.m.

After a half-hour of argument, the court called the parties to the bench to discuss an improper line of discussion in Rangel's closing. The court warned it would conclude Rangel's closing if further improper argument leading to interruptions occurred, to which Rangel's counsel responded, "It's probably the end anyway because I don't have enough time." When counsel resumed argument, she spoke for less than a minute more and concluded her closing argument at 4:50 p.m.

### b. *Discussion*

A trial court has broad discretion to grant or deny continuances. (*Jenkins*, *supra*, 22 Cal.4th at p. 1037; see *Morris v. Slappy* (1983) 461 U.S. 1, 11–12 ["Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the

77

same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel"].) We review a trial court's denial of a continuance request for abuse of discretion. (*Jenkins*, *supra*, 22 Cal.4th at p. 1037.) Rangel argues the trial court abused its broad discretion in denying two continuance requests made on the same day: the first, to contact a witness that had already testified to determine whether that witness could supply appropriate surrebuttal testimony, and the second, to wait until the following day to present closing argument in case the jurors were tired. The trial court acted within its discretion in denying both requests.

Rangel bore the burden to demonstrate good cause for a continuance to secure a surrebuttal witness. (*Jenkins*, *supra*, 22 Cal.4th at p. 1037.) Rangel must have — and did not — show he exercised due diligence in securing the witness's presence, that the expected testimony was material, noncumulative, and could be secured within a reasonable period of time, and that the facts to which the witness was expected to testify could not otherwise be proven. (*Ibid.*) We accord substantial deference to a trial court's determination of these issues. (*People v. Howard* (1992) 1 Cal.4th 1132, 1172.)

As Rangel conceded before the trial court, he was unable to show that Ruben's expected testimony in surrebuttal would be material, noncumulative, or would concern facts not otherwise capable of proof. When the trial court asked if Rangel intended to present a surrebuttal witness, Rangel acknowledged only that it was "possible" he would do so. When called upon to be more specific, Rangel replied that he "might" call Ruben. Rangel was given an opportunity to contact Ruben and to make an offer of proof regarding the expected surrebuttal testimony; Rangel squandered that opportunity. Far from showing diligence in attempting to secure the witness's testimony, Rangel informed the court that he made no effort whatever to contact the witness.

78

In evaluating a continuance request, the trial court considers the benefit of the expected testimony as anticipated by the party seeking additional time, as well as the likelihood that the expected benefit will be realized, the burden caused to jurors and the court, and whether justice is better served by granting or denying a continuance. (*Jenkins*, *supra*, 22 Cal.4th at p. 1037.) Without being able to assess the benefit of the expected testimony, the court properly concluded that the burden on the jurors and court outweighed any possible advantage, and justice would be better served by denying the request. (*Ibid.*) Rangel argues the parties discussed jury instruction issues with the court during much of two and one-half hours provided to contact the witness. While true, this fact does not demonstrate why Rangel was unable to make an effort to contact Ruben or make an offer of proof concerning the witness's testimony. Because Rangel offered the court nothing to evaluate, the court acted within its considerable discretion in denying Rangel's requested continuance.

Likewise, the court did not err in denying the request to continue closing argument until the following day. As section 1050 indicates, "[c]ontinuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) Convenience to a party does not constitute good cause. (*Ibid.*) Rangel argued the jurors were overtired and would be disinclined to attend carefully to the closing argument. The court weighed the burden to the court and jury against the convenience to counsel. The court determined the jurors were not overtired despite the time of day because the jurors had spent little time in court. Although Rangel argued he would be forced "to rush," the court agreed that court could remain in session past the usual adjournment time of 4:30 p.m. to complete Rangel's closing argument. Rejecting that compromise, Rangel insisted "the jurors will not be listening." Although it is impossible to measure juror attentiveness on a cold record, several factors suggest the jurors were as rested and ready to receive argument as possible. Immediately before Rangel's closing argument, the jurors had been given a fifteen-minute break. During the short closing argument, a juror requested and received a

bathroom break, permitting the other jurors to return briefly to the jury room to "stretch their legs." In light of these breaks and the relatively light day jurors spent in court, we find no fault with the court's refusal to credit counsel's baseless concern that the jurors would not be listening at 4:00 p.m. Accordingly, the trial court did not err by denying Rangel's request for a continuance. (*Jenkins*, *supra*, 22 Cal.4th at pp. 1037–1038.) Because we conclude there was no error, it necessarily follows that no prejudice resulted. (See *Morris v. Slappy*, *supra*, 461 U.S. at pp. 11–12.)

### 4. Section 190.3

Rangel argues that the "circumstances of the crime" language of section 190.3, subdivision (a) is unconstitutionally vague and overbroad because it permits the introduction of victim impact evidence with no limits. He also argues that introduction of victim impact evidence was erroneous and that the trial court erred by failing to instruct the jury concerning how to evaluate the victim impact evidence.[23] We conclude these contentions lack merit. As Rangel acknowledges, this court has rejected identical challenges to the constitutionality of section 190.3, subdivision (a), and he presents us with no reason to reconsider our prior holdings here. (*People v. Brady* (2010) 50 Cal.4th 547, 573–574.)

Victim impact evidence concerning the effect of the murders on the family members "is relevant and admissible under section 190.3, factor (a) as a circumstance of the crime." (*People v. Brady*, *supra*, 50 Cal.4th at p. 574, see also *Payne v. Tennessee* (1991) 501 U.S. 808, 825.) Such evidence is barred under the federal Constitution only if it is so extremely prejudicial that the whole of the trial is rendered fundamentally unfair. (*Ibid.*)

Here, Encinas's two adult siblings and girlfriend (Beltran) provided testimony about Encinas's childhood, their memories of him, and his goals of becoming a police

---

[23] Rangel's claim of instructional error is addressed in section II.B.2., *ante*.

officer and marrying Beltran. They testified about the difficulty their family was experiencing following Encinas's death and their feelings of loss and sorrow. Several photographs depicting Encinas at various stages of his life were introduced, and Rangel claims the introduction of each photo (save the one of Encinas immediately prior to his death), as well as the testimony from Encinas's siblings and girlfriend, constituted error.[24]

We disagree. The victim impact testimony of Encinas's two siblings and fiancée comprised just 30 pages of the nearly 3,400-page record. In contrast, we held that "testimony span[ning] several hours over two days" from nine different witnesses, including a victim's four siblings and fiancée, was not unduly prejudicial. (*People v. Brady*, *supra*, 50 Cal.4th at p. 573; *id.* at pp. 574–578.) Similarly, the introduction here of just a few photographs was not unduly prejudicial as we have in the past permitted the introduction of "numerous photographs." (*Id.* at p. 573; *id.* at pp. 574–577.) When victim impact evidence briefly addresses a victim's childhood to give context to testimony regarding their adult behavior, that testimony is not impermissibly inflammatory. (*Id.* at p. 577.) Rangel cites out of state authority to demonstrate that unduly prejudicial evidence was introduced here. Reliance on this extra-jurisdictional authority is unavailing. (*Ibid.*) As we explained in *People v. Brady*, "[t]hese cases are

---

[24] Rangel raises a single challenge with regard to victim impact evidence concerning Urrutia: he claims that the victim impact phase was too much like a memorial service, as evinced when the court permitted Urrutia's sister to be recalled, over objection, to describe an event during which Urrutia dressed as a giant pancake. We conclude the trial court did not abuse its discretion in permitting the introduction of this testimony, which lasted just minutes. The court noted that while the victims' family members experience benefit in talking about their loss, "it has to stop somewhere." The prosecution agreed that this witness would be the last, and her testimony would be brief. Particularly when considered in contrast with *People v. Brady*, in which we affirmed the propriety of victim impact testimony comprised of nine witnesses providing hours of testimony over the course of two days, this single witness being recalled to provide a minutes-long anecdote did not render the penalty phase unconstitutional or fundamentally unfair. (*People v. Brady*, *supra*, 50 Cal.4th at pp. 573–578.)

not binding on this court. The jury here heard traditional victim impact evidence: family members and friends extolled [the victim's] virtues and demonstrated they missed him. Neither the type nor the amount of evidence warrants reversal." (*Ibid.*)

### 5. Mitigating Evidence

Mora argues that the trial court erred by failing to require that the prosecution disclose the identity of a rebuttal witness, depriving Mora of an opportunity to evaluate whether to present certain evidence in mitigation. We find no error, but conclude any would have been harmless in any event.

#### a. *Background*

In addition to other mitigation evidence, Mora intended to present witnesses to testify that, during his incarceration following his arrest for these crimes, Mora served as a "module trustee," in which capacity he served meals, cleaned, and otherwise followed orders. The prosecutor discussed her intention to present a possible rebuttal witness, Deputy Lucero, who would — depending upon what evidence Mora's mitigation witnesses presented — testify that Mora was not a "trustee per se," and was not housed with other module trustees. The mitigation witnesses Mora planned to present concerning his module trustee status were not anticipated to provide evidence of Mora's good character. After presenting a number of other witnesses but before presenting testimony regarding Mora's "module trustee" status, Mora asked the prosecution if there would be any rebuttal. The prosecution responded negatively, but explained that there would be a rebuttal witness available "just in case." The prosecution elaborated, "I have no idea what they could rebut, since I haven't heard any testimony. I have some idea it might have something to do with being a trustee, but I don't have any statement." Mora did not object to the prosecution's plan to have a rebuttal witness available in case Mora presented mitigation evidence concerning his "module trustee" status, and no further argument on the subject occurred.

The next court day began with an Evidence Code section 402 hearing regarding the nature of the mitigation evidence Mora expected to proffer. The prosecution argued that if Mora presented character evidence, "it's fair game in rebuttal to me. I'm not saying what I have or don't have, but if they put that in, I believe . . . rebuttal testimony in penalty phase is admissible to correct misleading impressions of the defense case." The prosecution further asserted, "I'm not obligated to tell what I might have in store, or maybe I don't have anything." Again, Mora did not object, asserting simply that the witnesses were not expected to provide character testimony.

The court ruled any mitigating evidence regarding Mora's status as a "module trustee" was admissible, but expressly noted that it might open the door to rebuttal evidence. The prosecution would be restrained in how far to take that rebuttal, but evidence of "less than positive" "jail behavior" would be admissible. Mora decided against calling the witnesses who would have testified regarding his "module trustee" status, and Mora presented no further evidence in mitigation.

b. *Discussion*

According to Mora, the prosecution's failure to disclose the identity of the witness who would have rebutted testimony regarding Mora's "module trustee" status constituted error, as did the trial court's failure to provide a specific ruling regarding the scope of rebuttal evidence. We have held that "[t]he due process clause requires notice that the defendant will have the opportunity to discover the prosecutor's rebuttal witnesses." (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 375.) Even though the discovery statute does not specify that rebuttal witnesses must be disclosed, "the only reasonable interpretation of the requirement that the prosecution disclose '[t]he names and addresses of persons the prosecutor intends to call as witnesses at trial' is that [section 1054.1[25]]

---

[25] In its entirety, section 1054.1 provides, "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is

83

includes both witnesses in the prosecution's case-in-chief and rebuttal witnesses that the prosecution intends to call." (*Ibid.*)

Although the due process clause commands disclosure of *known* rebuttal witnesses, we conclude that no error occurred here. First, Mora raised no objection before the trial court regarding the prosecution's failure to disclose its rebuttal witness's identity. Accordingly, Mora's claim of error arising from the failure to so disclose is forfeited. (See *Gutierrez*, *supra*, 45 Cal.4th at p. 819.) Even if the issue was preserved for our review, we would find no error. Before the penalty phase commenced, the prosecutor alerted Mora that a rebuttal witness could provide testimony that Mora's "module trustee" status was controverted should Mora present testimony about that status. Mora ultimately decided against presenting evidence about his alleged trustee status, which the prosecution could not have known. Had the prosecution *absolutely* intended to call a witness to rebut the proposed mitigation evidence, the disclosure requirement may have been triggered. (*Izazaga v. Superior Court*, *supra*, 54 Cal.3d at p. 375.) That triggering would have depended on Mora's disclosure of the witnesses he intended to call. Mora's equivocation on the issue of whether to present evidence about his "module trustee" status rendered speculative the possibility of the prosecution's intent to present a rebuttal witness. The due process clause does not command the disclosure of all possible witnesses, but only those anticipated. Accordingly, we hold no error resulted

---

in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] (a) The names and addresses of persons the prosecutor intends to call as witnesses at trial. [¶] (b) Statements of all defendants. [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged. [¶] (d) The existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial. [¶] (e) Any exculpatory evidence. [¶] (f) Relevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial, including any reports or statements of experts made in conjunction with the case, including the results of physical or mental examinations, scientific tests, experiments, or comparisons which the prosecutor intends to offer in evidence at the trial."

from the prosecution's lack of disclosure because the decision to call a rebuttal witness depended upon the testimony Mora would have presented, had he opted to do so. We also conclude the trial court did not err by failing to provide a more specific ruling regarding rebuttal testimony because it was unable to rule more certainly without knowing what evidence the witness Mora did not call might provide.

Even if the prosecution's failure to disclose its rebuttal witness was erroneous, any such error was harmless because there is no reasonable possibility that the error affected the verdict. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961.) "[T]o find prejudice, we must find both (1) a reasonable possibility defense counsel would have presented the mitigating evidence . . . and (2) a reasonable possibility the verdict would have been different had defendant presented the mitigating evidence." (*Id.* at p. 961.) The evidence would have shown, at most, that Mora adjusted well to a custodial setting, becoming a more rule-abiding person. That evidence would have been tempered by evidence presented in aggravation that Mora committed an assault in a different custodial setting. Because the jury may not have given evidence concerning Mora's "module trustee" status significant weight in light of the contrasting aggravating evidence, and because in any event there is not a reasonable possibility that the verdict would have been different had the evidence been presented, we hold that error, if any, was harmless. (*Id.* at p. 961.)

### 6. CALJIC No. 8.85

Mora and Rangel argue that the trial court erred by failing to instruct the jurors, in addition to CALJIC No. 8.85, with a requested further instruction stating, "However, you may not double count any 'circumstances of the offense' which are also 'special circumstances.' That is, you may not weigh the special circumstance[s] more than once in your sentencing determination." Mora and Rangel acknowledge we have consistently found no prejudicial error in a trial court's denial of identical requested instructions, holding that " 'in the absence of any misleading argument by the prosecutor or an event

85

demonstrating the substantial likelihood of "double-counting" reversal is not required.' " (*People v. Monterroso* (2004) 34 Cal.4th 743, 790, quoting *People v. Proctor* (1992) 4 Cal.4th 499, 550.)  Although Mora and Rangel suggest the trial court's and prosecution's apparent confusion over applying the prohibition against double-counting itself demonstrates a substantial likelihood that jurors would misunderstand, they point to no argument by the prosecution or event that would have misled the jury.  (*People v. Monterroso*, *supra*, 34 Cal.4th at p. 790.)  Moreover, "[w]e presume that jurors are intelligent and capable of understanding and applying the court's instructions."  (*People v. Butler* (2009) 46 Cal.4th 847, 873.)  Even if the prosecution and court misunderstood CALJIC No. 8.85, in light of our presumption that the jurors did not, and because no argument or event occurred misleading the jury, we need not disturb our long-standing rule that the trial court did not prejudicially err by refusing to modify CALJIC No. 8.85.

### 7.      Multiple Murder Special Circumstance

Mora and Rangel argue that the multiple murder special circumstance must be overturned because it violates the Eighth and Fourteenth Amendments.  We have repeatedly rejected similar claims because the multiple murder special circumstance narrows the class of death-eligible defendants.  (*People v. Sapp* (2003) 31 Cal.4th 240, 286–287.)  "For the multiple murder special circumstance, a defendant must, in the same proceeding, be convicted not only of first degree murder, but also of 'more than one offense of murder in the first or second degree.'  (§ 190.2, subd. (a)(3).)"  (*People v. Sapp*, *supra*, 31 Cal.4th at p. 286.)  Mora and Rangel argue that the multiple murder special circumstance is unconstitutionally "wanton or freakish" because it permits a person who accidentally kills a woman and the nine-week-old fetus she did not know she was carrying to be given the death penalty, but that same penalty is not applied to a killer motivated by racial animus who murders several people.  (See *United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1445.)  We rejected this exact argument in *People v. Sapp*,

86

which Mora and Rangel acknowledge, and they present no reason to disturb our longstanding conclusion. (*People v. Sapp*, *supra*, 31 Cal.4th at p. 287.)

### 8. Alleged Juror Misconduct

#### a. *Background*

Following the penalty verdict, Mora moved for a new penalty trial, arguing that postverdict discussions with jurors revealed information suggesting misconduct. According to a declaration executed by Mora's attorney, those discussions revealed that Juror No. 2 "formed an opinion that this was an execution" "because the shot was to the head," which opinion the juror "based on his military training and experience." Mora's attorney declared that Juror No. 2 "conclude[d] that since this was an execution, [Mora] should be executed. Once [Juror No. 2] decided this was an execution he did not consider any other factors." Mora alleged Juror No. 7 "changed her decision" and voted in favor of death after learning that "Mora, unlike Rangel committed an execution." Based on Juror Nos. 2 and 7's comments, Mora moved for a new penalty trial. Rangel joined in the new trial motion.

Mora and Rangel also jointly requested disclosure of juror contact information to further investigate claims of juror misconduct. Mora and Rangel sought and were granted a hearing to address disclosure of juror contact information, which was held on April 27, 1999. Prior to the hearing, the court contacted the jurors and informed them of Mora and Rangel's wish for disclosure of their identifying information. Prior to or during the April 27, 1999, hearing, Juror Nos. 1, 2, 4, 5, 6, 7, 8, 9, and 10 conveyed to the court their wishes that their identifying information not be shared with the defense. Juror Nos. 1, 2, 6, and 8 were present in court for the hearing; each confirmed their desire not to have his or her contact information disclosed. The court asked if Juror No. 2 wished to speak in court, and Juror No. 2 responded in the negative. Based on the jurors' wish not

to be contacted, the court denied Mora and Rangel access to contact information concerning those nine jurors.

Juror Nos. 3, 11, and 12 did not respond to the court's communication regarding the disclosure of their identifying information. The court provided Mora and Rangel with the names, addresses, and phone numbers of those three jurors. On May 17, 1999, Mora moved again for a new trial, and Mora's attorney submitted a declaration in support thereof indicating that he spoke with one of the three jurors who permitted the disclosure of contact information. That juror "did not specifically remember any deliberation regarding military expertise." Mora's attorney declared that the juror also told him the jurors did not believe the murder would have happened had Mora not paged Rangel that night. Mora argued a new trial was warranted because improper evidence concerning Rangel was considered by the jury to permit imposition of the penalty with regard to Mora. Rangel separately moved for new trial, but did not argue that juror misconduct supported his request.

The court heard Mora and Rangel's updated new trial motions on May 27, 1999. Mora urged the court to grant a new penalty trial based in part on juror misconduct during penalty phase deliberations, and the inability to contact jurors thereafter. Following argument, the court denied both Mora and Rangel's motions for new trial. The court ruled that Mora's attorney's declaration in support of the motion for new trial constituted inadmissible hearsay, but even if it was capable of consideration, the statement was not "in and of itself . . . sufficient to demonstrate any misconduct on the part of the jury." The court explained that "jurors are not required to discuss or disclose their process . . . . [A]bsent a showing . . . to demonstrate jury misconduct, the court has to assume there was none."

88

b.    *Discussion*

Mora and Rangel argue the court erred by denying their motion for new trial based on jury misconduct.  More specifically, they argue the trial court was obliged to hold an evidentiary hearing once it learned of potential juror misconduct, and its failure to do so constituted error.  We conclude the trial court was under no obligation to hold a hearing, and neither its failure to do so nor its denial of Mora and Rangel's motions for new trial based on juror misconduct constituted error.

"Hearsay evidence offered in support of a new trial motion that is based on alleged jury misconduct ordinarily is insufficient to establish an abuse of discretion in either denying the motion or declining to conduct an evidentiary hearing."  (*People v. Manibusan* (2013) 58 Cal.4th 40, 55, citing *People v. Dykes* (2009) 46 Cal.4th 731, 810.)  Mora argued that the court should nevertheless have granted an evidentiary hearing because, without access to juror contact information and absent jurors' willingness to speak to defense counsel, he was unable to fact-find regarding "representations that had been made by the jurors at the time of the verdict."[26]  Mora and Rangel claim that, even if hearsay, the content of Mora's attorney's declarations made the trial court aware of potential juror misconduct, triggering a duty to conduct a reasonable inquiry — here, an evidentiary hearing — to resolve the matter.

Of course, granting a new trial may be warranted if a jury engages in misconduct that prevents impartial consideration of the case.  (*People v. Hayes* (1999) 21 Cal.4th 1211, 1255.)  *Hayes* does not, as Mora and Rangel assert, require that a trial court conduct an evidentiary hearing once the specter of misconduct is raised.  "When

---

[26]    We note that the People assert that Rangel forfeited any right to raise this issue on appeal because he did not raise juror misconduct in his motion for new trial or interpose an objection based on this ground at trial.  Rangel did, however, join Mora's initial new trial motion based on alleged juror misconduct.  Because we conclude that the trial court did not err by declining to hold an evidentiary hearing or by denying the motions for new trial based on juror misconduct, there is no need to reach the issue of Rangel's potential forfeiture.

allegations of juror misconduct . . . raise a presumption of prejudice" a court may, but is not required to, conduct an evidentiary hearing. (*Ibid.*) In contrast, when a court becomes aware of the possibility of misconduct, its only obligation is to " ' "make whatever inquiry is reasonably necessary" ' to resolve the matter." (*Ibid.*, quoting *People v. Hedgecock* (1990) 51 Cal.3d 395, 417.) This obligation is triggered only when the defense provides evidence strongly suggestive of prejudicial misconduct. (*Hayes*, *supra*, 21 Cal.4th at p. 1255.) As we acknowledged in *Hayes* and have reiterated many times, hearsay is ordinarily "not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct." (*Id.* at p. 1256.) In *Hayes*, because the only evidence of juror misconduct was the statement of counsel regarding purported out-of-court statements by a juror who did not herself provide any declaration, we concluded the trial court did not abuse its discretion in denying a motion for a new trial. (*Ibid.*)

Here, too, the only support for the motion for a new trial based upon juror misconduct are defense counsel's statements containing hearsay accountings of what jurors purportedly said. A trial court does not abuse its discretion in declining to hold an evidentiary hearing or denying a motion for a new trial when the only basis to grant such a hearing or trial is, as in this case, a defense attorney's hearsay assertions. (*People v. Manibusan*, *supra*, 58 Cal.4th at p. 55.) Mora and Rangel's arguments to the contrary are unavailing. They contend they had no access to jurors to obtain more reliable statements concerning misconduct, but the second declaration reveals that argument to be untrue. In support of the second new trial motion, Mora's counsel stated that he spoke with one of the three jurors who consented to the disclosure of contact information. That admission alone is sufficient to undermine Mora and Rangel's contention on appeal that they had no access to the jurors to probe the veracity of Juror Nos. 2 and 7's purported statements. They had access to 25% of the jurors, but it appears those jurors — or the one with whom Mora's attorney spoke — did not provide a statement in support of their assertion of juror misconduct. That juror apparently recalled nothing of the statements

about execution-style murder or military affiliation allegedly made by Juror No. 2. The trial court thus reasonably concluded that the only basis for new trial was discountable hearsay, and that the content of those hearsay statements revealed no misconduct. The court was not obliged to conduct an evidentiary hearing when the only support for such a hearing was hearsay, and its denial of Mora and Rangel's motion for a new trial did not constitute an abuse of discretion. (*Ibid.*)

### 9. Other Challenges to California's Death Penalty Law

Mora and Rangel raise a number of challenges to California's death penalty law, each of which they acknowledge we have previously rejected. While Mora raises each claim for exhaustion purposes only, Rangel contends that even if each claim has been separately rejected, we have not considered these challenges cumulatively, and doing so reveals an overbroad sentencing scheme lacking in procedural safeguards. Not only is Rangel incorrect in this regard (see *People v. Simon* (2016) 1 Cal.5th 98, 150 (*Simon*)), but because we reject each challenge to California's death penalty sentencing scheme, we also find no basis to conclude that the challenges collectively warrant invalidating the scheme.

Section 190.2 is not impermissibly broad in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution for failing to narrow the class of death-eligible murders. (*Simon*, *supra*, 1 Cal.5th at p. 149.) The 1978 death penalty law did not have the intended or practical effect of making essentially all murders death eligible. (*People v. Jennings* (2010) 50 Cal.4th 616, 688.) As addressed previously, section 190.3, subdivision (a), permitting a jury to consider the circumstances of the offense in sentencing, does not result in arbitrary or capricious imposition of the death penalty in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution. (*Simon*, *supra*, 1 Cal.5th at p. 149.)

The death penalty statutory scheme is not unconstitutional for failing to require the jury find beyond a reasonable doubt that aggravating factors outweigh mitigating factors. (*Simon*, *supra*, 1 Cal.5th at p. 149.) California's death penalty statutory scheme does not run afoul of *Apprendi* and its progeny for failing to so require. (*Simon*, *supra*, 1 Cal.5th at p. 149.) There is no federal constitutional requirement that the jury make written findings regarding factors in aggravation. (*Ibid.*)

Neither section 190.3 nor the federal constitution require that a comparison between the instant case and similar cases be evaluated with respect to the proportionality of the sentence imposed. (*Simon*, *supra*, 1 Cal.5th at p. 149.) "During the penalty phase, the jury may consider a defendant's unadjudicated criminal activity and need not unanimously agree beyond a reasonable doubt that such criminal activity occurred." (*Id.* at p. 150.)

We have consistently concluded there is no burden of proof at the penalty phase. (*People v. Gamache* (2010) 48 Cal.4th 347, 406.) The trial court is under no obligation to instruct the jury that neither party bears the burden of proof. (*People v. Leonard*, *supra*, 40 Cal.4th 1370, 1429.)

The inclusion in the list of potential mitigating factors of the adjectives " 'extreme' " and " 'substantial' " does not serve as a barrier to the jury's consideration of mitigating factors in violation of the federal constitution. (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1429, citing *People v. Boyer*, *supra*, 38 Cal.4th at p. 484.) The jury need not be instructed that factors in mitigation may be considered only in mitigation. (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1429.) No error flows from a failure to instruct the jury that if mitigating factors outweigh aggravating factors, life is the appropriate sentence. (*People v. Jones* (2017) 3 Cal.5th 583, 620.) Mora's assertions to the contrary, as well as his argument that CALJIC Nos. 8.85 and 8.88 fail to provide the jury with the guidance necessary for imposition of the death penalty, are unavailing. (*Id.* at pp. 619–620.) Likewise, Mora's claim that the jury should have received an instruction that there

is a presumption in favor of life without parole is incorrect. (*Id.* at p. 620.) The court was not required to instruct that the jury's findings in favor of any factor in mitigation be unanimous. (*Ibid.*)

Finally, we have consistently rejected claims that international norms render the death penalty unconstitutional, and do so again here. (*Simon*, *supra*, 1 Cal.5th at p. 150.) We have also consistently concluded that "California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants." (*Ibid.*)

### 10. Cumulative Error

Mora and Rangel contend reversal is warranted because of the cumulatively prejudicial effect of penalty phase errors. To the extent any errors occurred, none were prejudicial. We conclude no error or assumed error in the penalty phase, whether considered separately or collectively, merits reversal. (*People v. Clark* (2016) 63 Cal.4th 522, 643.)

## III. DISPOSITION

We affirm the judgment.

**CUÉLLAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**KRUGER, J.**
**DETJEN, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING AND DISSENTING OPINION BY LIU, J.**


I respectfully dissent from the conclusion that there was sufficient evidence to sustain the attempted robbery special circumstance.  (Pen. Code, § 190.2, subd. (a)(17(A); see maj. opn., *ante*, at pp. 54–56.)  " '[T]o prove a felony-murder special-circumstance allegation, the prosecution must show that the defendant had an independent purpose for the commission of the felony, that is, the commission of the felony was not merely incidental to an intended murder.' "  (*People v. Horning* (2004) 34 Cal.4th 871, 907 (*Horning*).)  As with the felony-murder rule, the purpose of this special circumstance is to make eligible for the most severe punishment those defendants who escalate a serious felony into a murder, thereby attempting to deter such escalation.  Here the prosecution had to prove that the crime was "a murder in the commission of robbery" and not "a robbery in the commission of murder."  (*Ibid.*, citing *People v. Green* (1980) 27 Cal.3d 1 (*Green*).)  "The provision thus expressed a legislative belief that it was not unconstitutionally arbitrary to expose to the death penalty those defendants who killed in cold blood *in order to advance an independent felonious purpose*, e.g., who carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape."  (*Green*, at p. 61, italics added.)

The facts do not support a finding that defendants murdered their victims "in order to advance" a robbery.  (*Green*, *supra*, 27 Cal.3d at p. 61; see maj. opn., *ante*, at pp. 3–4, 55–56 [recounting details of the crime].)  Although there is

1

sufficient evidence to support the jury's finding that defendants intended to rob the victims, there is no credible evidence from which the jury could conclude beyond a reasonable doubt that defendants murdered the victims in order to advance an independent felonious purpose of robbing them. Rangel's initial contact with one of the victims announced his and Mora's lethal intent: "Do you want to go to sleep?" Neither his further statement "check yourself, check yourself, give me your wallet" nor Mora's similar request to the other victim suggests that their primary purpose in the encounter was to rob the victims. As the record shows, the victims attempted to comply with defendants' demands for their wallets, defendants shot the victims *before* the victims could comply, and defendants then fled *without* the wallets. There is no evidence that some intervening event caused defendants to abandon their plan to rob the victims after murdering them, nor is there evidence that defendants' motive to kill the victims sprang from the attempted robbery. The record here shows an attempted "robbery in the commission of murder." (*Horning*, *supra*, 34 Cal.4th at p. 907.) Viewing the evidence in the light most favorable to the verdict, there is no " ' " 'evidence that is reasonable, credible, and of solid value such that a reasonable jury could find' " ' " beyond a reasonable doubt (*People v. Smith* (2018) 4 Cal.5th 1134, 1174) that the murders were committed in order to advance the robberies.

I would therefore reverse the attempted robbery special circumstance. Nonetheless, I agree that the death sentence must be affirmed. The jury made a valid finding on the multiple-murder special circumstance, and the jury was permitted to consider at the penalty phase all the facts and circumstances underlying the murders. Accordingly, the invalidation of one of the two special

2

circumstances does not warrant reversal of the death sentence.  (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1186–1187.)


**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mora and Rangel

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S079925
**Date Filed:** July 2, 2018

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Victoria M. Chavez

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Peter R. Silten, Deputy State Public Defender, for Defendant and Appellant Joseph Adam Mora.

Tara K. Hoveland, under appointment by the Supreme Court, for Defendant and Appellant Ruben Rangel.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter R. Silten
Deputy State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

Tara K. Hoveland
1034 Emerald Bay Road, #235
South Lake Tahoe, CA  96150
(530) 541-2505

John Yang
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 445-9555